STATE of Tennessee, Appellee,

v.

John EVANS, Appellant.

Court of Criminal Appeals of Tennessee,
at Nashville.

Nov. 27, 1985.

Permission to Appeal Denied by
Supreme Court March 24, 1986.

Jim Weatherly, Metropolitan Public Defender, Nashville, for appellant.

W.J. Michael Cody, Atty. Gen., Kevin Steiling, Asst. Atty. Gen., Thomas H. Shriver, Dist. Atty. Gen., Victor S. Johnson, Mary Hausman, Asst. Dist. Attys. Gen., Nashville, for appellee.

## OPINION

DUNCAN, Judge.

The defendant, John W. Evans, was convicted of murder in the second degree and received a sentence of thirty-five (35) years. He was also convicted of five (5) counts of assault with intent to commit murder in the second degree and of five (5) counts of malicious shooting. The trial court merged the felonious assault convictions with the malicious shooting convictions, and the defendant received a sentence of four (4) years for each of the five (5) malicious shooting convictions. The defendant thus received a total sentence of fifty-five (55) years. All of his sentences were ordered to be served consecutively. He was sentenced as a Range I standard offender.

We point out that the defendant's wife, Lora Evans, and his brother, Curtis Evans, were jointly indicted and tried with the defendant. However, Curtis' motion for judgment of acquittal was granted by the trial court and Lora was acquitted by the jury.

In this appeal, the defendant raises numerous issues, including a challenge to the sufficiency of the evidence.

The State's evidence showed that on the night of November 5, 1983, the defendant, his wife Lora, his brother Curtis, and Curtis' wife Darlene, were at a tavern known as the Penalty Box. The defendant had a fight with some of the patrons of the tavern, ostensibly over some suggestive remark made by one of the patrons to the

defendant's wife. There was evidence that the defendant, while inside the tavern, kicked one patron in the mouth. Subsequently, further fighting took place outside the tavern. The defendant hit another individual with a pool cue stick. Apparently, the cue stick was taken away from the defendant, and he was hit with it, and was otherwise beaten up during the continuation of the fight in a ditch outside the tavern. Subsequently, after Lora was heard to say, "Get the guns," and "I'll get everyone of you son-of-bitches," she and the defendant drove away in their Chevrolet Nova automobile.

Within a very short time, a green four-door car was observed by witness Teresa Arnett as it passed the tavern. A shot was fired from this vehicle, striking other cars in the parking lot. Arnett's testimony established that this vehicle was the defendant's Nova in which he had previously left from the tavern. At any rate, within minutes after the first shot was fired, Arnett and several other witnesses heard a fusillade of shots that were fired from the outside of the tavern. Some of these shots hit vehicles in the parking lot and other shots hit inside the tavern. One of these shots entered the body of Mrs. Nancy Walker, entering on the left side of her back and passing through her left lung and her heart. Mrs. Walker died within minutes. Other shots that were fired into the tavern resulted in wounds to five (5) other patrons of the tavern.

That same night, investigation by the police officers led them to the trailer of the defendant, where the defendant, Lora, and Curtis were arrested.

Shell casings found on the outside of the tavern were compared by a firearm expert, Lanny Wilder, with shell casings found in the defendant's trailer and with a shell casing found in Curtis' Maverick automobile. Wilder determined that all of the .30 caliber cartridge casings had been "fired and ejected from the same firearm."

The defendant testified and admitted that he fired the shots, but he denied that he intentionally fired shots into the tavern.

According to the defendant, after the initial fight at the tavern, he and his companions went to his trailer. He decided to go back to the tavern to look for his glasses which he had lost. He got his M-1 .30 caliber carbine from the trunk of his Nova automobile and returned to the tavern in Curtis' Maverick automobile. He took the gun along to be sure he did not "get beat up any more." He was also accompanied by his dog, a large Doberman Pinscher. When the defendant arrived back in the vicinity of the tavern, he slowed down and began looking for the place where the fighting had occurred in the ditch, but could not determine the portion of the ditch in which he had been. Realizing that he was unable to find his glasses, the defendant testified that:

I started getting mad because I'd lost them, thinking about—...—thinking about all the problems I was going to have the coming week, because of the fact I didn't have them. I felt resentment at the people at the bar, because they did not stop this fight before I had lost them. By the time I got approximately to the driveway of the Penalty Box, which is located between the Penalty Box and the building next-door—... I picked up the gun, looked around the parking lot and didn't see anyone. Decided I'd bust out a couple of windshields. I fired one shot. Tried to fire a second shot. The gun wouldn't fire, it was apparently jammed. I continued on down Andrew Jackson to the stop sign at Old Hickory.

Thereafter, according to the defendant, he stopped at a stop sign, unjammed the gun, turned around and drove past the tavern once again, intending to fire more shots at the cars parked at the tavern. He stuck the gun out the window and "in a matter of seconds" fired 15 to 20 rounds. On his way back home, he threw the carbine into the back of a garbage truck. He was not aware that any of his shots had entered the tavern or that anyone had been injured. He reiterated that he never intended to cause injuries to any people.

■ The defendant argues that the proof failed to establish the element of malice. From our summary of the evidence, we readily find that the jury was warranted in finding that the defendant's actions on this occasion were done willfully and maliciously. The defendant's theory that he only intended to shoot at cars, and that he did not intend to shoot any of the patrons inside the tavern, was properly rejected by the jury. We note that the record indicates that none of the victims had been involved in the earlier altercation with the defendant. Apparently, all of those individuals who had earlier fought with the defendant were no longer in the tavern at the time of the shooting.

Another evidentiary complaint by the defendant is that the proof failed to establish that two (2) of the victims, Jane Dietz and Gerald Quinn, had been struck by bullets. Dietz testified she had been injured during the shooting, sustaining injuries to her neck, face, arms and back. Quinn testified that "a bullet or a piece of glass, or a piece of metal, or whatever it was, grazed my left ear. Just hit it hard enough just to split it open."

■ Although no expert testimony was adduced as to the cause of the injuries to these two (2) victims, their testimony and the other evidence was sufficient and provided an adequate basis upon which the jury could have reasonably inferred that they were struck by a bullet or a bullet fragment. Also, we are of the opinion that if someone is injured by reason of some object, whether it be a piece of glass, metal or otherwise, that is set in motion by reasons of the malicious firing of a bullet at such person, then that would be sufficient to constitute a malicious shooting under the provisions of T.C.A. § 39–2–112.

After considering all of the evidence, we find that it is overwhelming to show beyond a reasonable doubt the defendant's guilt of all these crimes. Any rational trier of the fact could have so found. T.R.A.P. 13(e); *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Next, the defendant contends that the trial court erred in denying his motion that he be provided with funds to hire his own ballistics expert.

In *Graham v. State,* 547 S.W.2d 531, 535–36 (Tenn.1977), our Supreme Court held that an indigent defendant does not have a right, under either the Federal or the State Constitution, to the services of a private psychiatrist at State expense. In *State v. Williams,* 657 S.W.2d 405, 411 (Tenn.1983), the trial court had denied the defendant's motion for funds to secure the assistance of an expert in the field of hair analysis. On appeal, our Supreme Court found no error, reiterating the holding of *Graham,* saying:

> Although the defendant "urge[s] this Court to adopt a rule of law allowing an indigent defendant funds for expert assistance," we decline to do so. "Essentially this is a matter that addresses itself to the judgment and discretion of the legislature. Thus far it has not seen fit to provide such services to indigent defendants." *Graham,* 547 S.W.2d at 536.

657 S.W.2d at 411.

The defendant acknowledges the status of the law in Tennessee as stated by the Court in *Graham, supra,* and *Williams, supra.* However, he argues that we should apply a contrary ruling to the present issue and seeks to rely on the recent United States Supreme Court decision in *Ake v. Oklahoma,* —— U.S. ——, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

In *Ake, supra,* the defendant was convicted of murder and was sentenced to death. Even though it was apparent at the outset that the defendant's sole defense would be that he was insane at the time of the offense, the trial court declined the defendant's motion to arrange for a psychiatrist to perform an examination or to provide funds to allow the defense to arrange for one, so the defendant could be examined as to his mental status at the time of the crime. It was also apparent at the outset that the defendant had mental problems, and although he had been examined by a State psychiatrist on the question of

his competency to stand trial, no examination had been made on his mental status at the time of the commission of the offense. Consequently, there was no expert testimony at his trial regarding his mental state at the time of the offense.

Under these circumstances, the United States Supreme Court held that:

[W]hen a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue, if the defendant cannot otherwise afford one.

105 S.Ct. at 1092.

The present case before us is readily distinguishable from *Ake, supra.*

First, *Ake* concerned a request for psychiatric help in a capital case where, at the outset, it was shown that there was a reasonable basis for an insanity defense to be offered. The instant case concerned a request for funds to hire a ballistics expert in a non-capital prosecution where the defendant made no preliminary showing that such expertise was needed to aid him in his defense.

Second, there was no expert testimony offered by either side in *Ake* regarding the defendant's mental state at the time of the commission of the offense. In the instant case, the State offered competent, reliable, and unchallenged expert evidence regarding the ballistics tests that were made.

Additionally, the defendant in *Ake* was confronted with an instruction that he "was to be presumed sane at the time of the crime unless *he* presented evidence sufficient to raise a reasonable doubt about his sanity at that time." *Ake, supra,* 105 S.Ct. at 1091 (emphasis added by Supreme Court). In the instant case, the jury was not instructed that the State's ballistics tests should be presumed accurate unless the defendant raised a reasonable doubt about the test results. The defendant was under no burden to offer evidence of any kind.

Also, we point out that the record contains nothing to indicate any unreliability regarding the ballistics tests. The defendant's contention is therefore based entirely upon speculation as to what an additional ballistics expert *might* have found. This is a clear contrast to the factual situation in *Ake,* in which the defendant clearly had a history of psychiatric disorders which would have been favorable to a defense of insanity.

Moreover, in the present case, neither pretrial, nor during the trial, did the defendant ever suggest the theory that his weapon was not the weapon from which the shots were fired that caused the death of Mrs. Walker and the injuries to the other victims. In fact, the defendant took the stand and acknowledged that he fired these shots. His only theory was that he did not intend to shoot into the tavern and hurt the victims. Thus, his own testimony confirmed the results of the ballistics tests. Therefore, the question arises as to what possible benefit to the defendant's case could have resulted from having additional tests conducted by an expert of his own. Clearly, if additional reliable tests had been conducted, they would only have served to confirm the analysis made by the State's expert.

We also point out that apart from the ballistics tests and the defendant's own testimony, the other evidence offered by the patrons of the tavern clearly implicated the defendant in these crimes.

■ From all of the above, it is abundantly clear that the defendant has suffered no constitutional deprivation by the trial court's refusal to provide funds to him for the hiring of his own ballistics expert.

In another issue, the defendant argues that malicious shooting is a lesser included offense of assault with intent to commit second degree murder, and that therefore the trial court should have merged the malicious shooting convictions into his felonious assault convictions instead of the reverse fashion in which the trial court merged the offenses.

■ This argument is not tenable because malicious shooting is not a lesser included offense of felonious assault with intent to commit second degree murder. *See McCroskey v. State*, 42 Tenn. 178 (1865). In *McCroskey*, the Supreme Court was concerned with the question of whether malicious shooting was embraced within the offense of felonious assault with intent to commit murder in the first degree. The Court held:

> The offense of "malicious shooting," is not embraced within the offense of a felonious assault, with the intent to kill and murder in the first degree. The offenses are separate, distinct and independent, and in no sense, are they different grades of the same offense.

42 Tenn. at 179–80.

Thus, it necessarily follows that since malicious shooting is not a lesser included offense of assault with intent to commit murder in the first degree, it would likewise not be a lesser included offense of assault with intent to commit murder in the second degree.

■ Also, we find no error in the trial court's denial of the defendant's motion for a mistrial when the witness Gerald Quinn testified that the defendant offered to sell him "a quaalude or two." The statement by Quinn was unsolicited by the prosecuting attorney. The trial court gave a cautionary instruction to the jury, telling them to disregard the testimony and for them not to consider it for any purpose. It is assumed that the jury followed the trial court's instruction. *Klaver v. State*, 503 S.W.2d 946 (Tenn.Cr.App.1973).

Further, we find no merit to the defendant's complaint about two (2) photographs that were admitted into evidence. One photograph depicted the interior of the tavern. In the foreground of this picture is a pool table on which there is a blood stained pool cue stick. The other photograph is one of the defendant that was recovered from his trailer. It shows the defendant holding a .30 caliber carbine.

The first photograph illustrated a view from the rear of the Penalty Box toward the front door. Also, the pool cue stick shown was apparently the one used in the first fight at the tavern.

The other photograph provided the only appearance of the weapon used in the shooting, as the weapon itself was never recovered. The length of the barrel of the weapon was an issue involved in the cross-examination of the defendant and this photograph sheds some light as to the length of the barrel. The fact that this photograph depicts the defendant with a beard and shirtless does not make it inflammatory.

■ We conclude that both photographs were probative. There is nothing in either that could be characterized as gruesome or inflammatory. We find no abuse of discretion in the admission of these photographs into evidence. *State v. Banks*, 564 S.W.2d 947 (Tenn.1978); *Collins v. State*, 506 S.W.2d 179 (Tenn.Cr.App.1973).

The defendant also alleges error in the trial court's refusal to allow surrebutal testimony by Joe Salome, who was counsel for codefendant Curtis Evans.

After Steve Lock testified in rebuttal for the State about a conversation he had with the defendant in which the defendant made an implicating statement while the two (2) were in a holding cell together, the defendant proposed to call Mr. Salome to testify that when he tried to talk to the defendant, the defendant told him that he had been advised by his own counsel not to discuss the case with anybody.

■ We agree with the trial court that this was not proper surrebutal testimony. Nothing in Salome's proposed testimony would contradict Lock's testimony. The fact that the defendant had been told by his counsel on one occasion not to talk to anyone would not serve to disprove that he had in fact talked to Lock on another occasion. Also, the record shows that following the trial court's refusal of Salome's testimony, the defendant himself took the stand and directly rebutted the testimony of Lock. Thus, defendant was not denied

the opportunity to rebut Lock's testimony. This issue is meritless.

The defendant next contends that the prosecuting attorney improperly argued that "nobody in the garbage truck" ever found the weapon.

The defendant had testified that he disposed of the weapon used in the shootings by throwing it in a garbage truck. The defendant correctly argues that there was no proof that anyone ever searched for the weapon and could not find it.

 Nonetheless, the jury was well aware that the weapon was not introduced into evidence, so it had to be obvious that it was never found. Under these circumstances, this isolated remark could in no way have served to prejudice the defendant. We find no prejudicial error regarding this matter.

The defendant also complains about the trial court's denial of his special request for instructions. This instruction related to the defendant's theory that he did not intend to shoot the victims, that their wounds were accidentally inflicted and that thus, the homicide of Mrs. Walker could not rise above the offense of involuntary manslaughter and the shooting of the other victims would only amount to assault and battery.

 The trial court's main charge accurately charged the correct principles of law regarding the offenses of involuntary manslaughter and assault and battery. The charge included in substance the requested instruction, and the charge, as a whole, fully and fairly stated the applicable law. Therefore, the trial court was under no obligation to give the requested instruction. *Edwards v. State,* 540 S.W.2d 641, 649 (Tenn.1976); *State v. Story,* 608 S.W.2d 599, 603 (Tenn.Cr.App.1980).

Finally, we find no error regarding the defendant's sentence of thirty-five (35) years as set by the trial court for his offense of second degree murder.

 The trial court properly weighed the enhancement and mitigating factors as such are set forth in T.C.A. §§ 40–35–111 and 40–35–110. The trial court noted that several enhancement factors were present. The record supports the trial court's findings in this regard. Thus, we conclude that the trial court's imposition of the maximum sentence for second degree murder was proper.

Also, we find that the trial court did not err in ordering the defendant's sentences to be served consecutively.

 The trial court found that the defendant was a "dangerous offender," as such term is defined in *Gray v. State,* 538 S.W.2d 391, 393 (Tenn.1976). The record shows that the defendant's crimes indicate he has little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. *Gray, supra,* at 393. The shooting of multiple shots from a .30 caliber semi-automatic carbine into a tavern filled with people, and without any justifiable reason, negates the defendant's argument that no aggravating circumstances are present in this case.

The trial court correctly found the defendant to be a dangerous offender, and thus he was an eligible candidate for consecutive sentencing.

The judgments of the trial court are affirmed.

O'BRIEN, J., and SAM E. BOAZ, Special Judge, concur.