STATE of Tennessee, Appellee,

v.

Joseph Arlin SHEPHERD, Appellant.

Supreme Court of Tennessee,
at Knoxville.

May 30, 1995.

Rehearing Denied Aug. 21, 1995.

Charles W. Burson, Atty. Gen. & Reporter, Christina S. Shevalier, Asst. Atty. Gen., Nashville, for appellee.

Charles M. Corn, Cleveland, Reed Dixon, Sweetwater, Brock Mehler, Capital Case Resource Center, Nashville, for appellant.

## *OPINION*

O'BRIEN, Justice.

Joseph Shepherd was charged in an 11 count indictment by the Monroe County Grand Jury. As relevant in this case he was charged with the murder of sixteen year old Roxanne Woodson during the commission of a felony; charged with premeditated murder of Roxanne Woodson, and charged with the aggravated assault of two Monroe County law enforcement officers. He was found guilty of felony murder in the commission of rape in Count 1 and sentenced to death. He was found guilty of aggravated assault in Count 9 and sentenced to not less than two (2) nor more than five (5) years in the State penitentiary.

On this appeal appellant has raised 16 issues the majority of which pertain to the guilt phase of the proceeding. Due to error in the sentencing process it is necessary for this Court to remand for sentencing. As a result we review the evidence to establish its

sufficiency, and respond only to those issues which we conclude might have affected the outcome of the guilt proceedings.

The trial in this case occurred in April, 1991. At the trial Frankie Harris and his cousin, Charles Bovard, testified to the events that had occurred on 27 February 1978, 13 years before, when Roxanne Woodson disappeared. Harris, who was 15 years of age in 1978, had been Roxanne's boyfriend. About dusk on that day, Roxanne, Frankie, Charles, then 13, and his 16–year–old brother, Wilbur Bovard, were gathered in the Bovard's yard on Old Federal Road in Monroe County when the defendant, a 25–year–old acquaintance of Harris and his cousins, drove up in his car and asked the teenagers if they wanted to ride around. After Roxanne received her father's permission to go, the group drove to the home of the grandfather of the Bovards in Mt. Vernon so that Wilbur could telephone his girlfriend, Judy McDaniel, and ask her to join them. According to Charles, while Frankie and Wilbur went inside to make the phone call, defendant took a large hunting knife from under the car seat and, after playing with it for a while, brushed Roxanne across the breast with the weapon. About that time Frankie and Wilbur returned to the car with some pills [1] and the party proceeded to Tellico, where they picked up Judy McDaniel.

The group then drove to a steel bridge over the Tellico River where they sat and talked for a few minutes. About 8:00 p.m., Judy and Wilbur began to quarrel and decided to walk back to town. They told the defendant to pick them up later. The remaining members of the group decided to drive back to Tellico. When they reached Tellico Beach, however, defendant turned up Old Furnace Road. After driving about a mile defendant stopped the car and approached Roxanne about having sex with him. When she refused, defendant persisted for several minutes. Roxanne continued to

rebuff him. According to Charles Bovard defendant then leaped into the back seat, where Roxanne was sitting with Frankie, and wrestled with her until everyone got out of the car. Frankie calmed Roxanne down, who was crying and hysterical. Defendant walked up to Roxanne with a pistol and told her, "if you don't shut up, I'm going to blow your brains out." [2] After the boys convinced Roxanne to get back into the car they drove further up the mountain and stopped the second time in an area that had been clear cut during logging operations.

Frankie Harris testified that it was at this second stop, not the first place, that the defendant assaulted Roxanne and pulled the gun. This witness also testified that the defendant demanded sex from Roxanne while the gun was drawn but that she again refused. Both Frankie and Charles testified that after they parked on the roadside the second time, the two of them had gotten out of the car to use the bathroom. Defendant also left the car and asked the boys to walk down the road "a little bit" while he talked with Roxanne to calm her down so she would not "call the law" on him. Frankie and Charles walked a short distance down the road, relieved themselves and returned in about five minutes. During this time Charles heard the sounds of a scuffle and Roxanne say, "you son of a bitch."

When the two (2) boys returned to the car, neither the defendant nor Roxanne was in sight. About a minute later, defendant came running out of the woods and told them that Roxanne had thrown a comb at him and "run off." The three called for Roxanne and searched for her along the road in the direction in which Frankie and Charles had gone to use the bathroom. After getting back into the car, they continued their search as they drove down the mountain by calling Roxanne's name and stopping occasionally. They also asked a man at the only house on the road if he had seen a girl walk by. He

---

1. There was also testimony that members of the party were drinking alcohol or moonshine.

2. It was never determined in the testimony whether the pistol was real or a toy.

replied that he had not.[3] The three continued back toward Tellico and picked up Wilbur and Judy. After dropping Judy off in town the four (4) boys returned to the mountain, called for Roxanne, but received no response. Defendant took the boys home and told them he would go back to look for Roxanne. He admonished them to keep quiet about what had happened.

The next day, after Roxanne's father came to the homes of Frankie and Charles looking for his daughter, a massive search began for the missing girl. During the search a bloodhound was taken to the spot where the defendant had stopped the car the second time. After taking a scent from an article of Roxanne's clothing, the dog tracked a path from the area where the car had been parked to a brush pile about 100 yards away. No trail was found away from the brush pile in any other direction. Searchers noticed an indentation in the pile and evidence that the brush had been disturbed.

On the evening of 28 February 1978, deputy Bill Bevins and Officer Marshall Hendricks went to the home of Shepherd's parents in Tellico, where the defendant lived, to talk with him about Roxanne's disappearance. During their visit he agreed to show the officers where he had last seen her and went into his bedroom to put on his shoes and coat. Deputy Bevins could hear defendant cursing and talking to himself while he was in the bedroom, saying, "I'm getting goddamn tired of being aggravated by these sons of bitches about these damn whores." Defendant then came out of the bedroom holding a single-shot .12 gauge shotgun. Hendricks pushed Bevins into the kitchen, drew his revolver and shot at the defendant, who was immediately disarmed and restrained by his parents. The officers called

for help and defendant was taken into the custody of the Monroe County Sheriff's Department.[4] The next day Deputy Graves took the defendant to the location where Roxanne was last seen. Defendant participated in the search that day, but a day or two later he disappeared. He was not seen again by authorities until 29 March 1978 when he was arrested on a fugitive warrant in Gastonia, North Carolina. He was found hiding in some quilts at the home of his former wife's parents. He declined to waive extradition and remained in North Carolina.

On 8 April 1978 defendant's parents summoned authorities to their home where Roxanne Woodson's body was discovered in a shallow grave in an area where junk was scattered, approximately 100 feet from their home. Early spring vegetation was growing from the grave which had been covered with a car seat. Her hands, which were described as gnarled and weathered, and her half-eaten toes were protruding from the ground. Upon exhumation, her putrescent body was found lying on its back with a denim jacket wrapped around her head. The upper torso was clad in a shirt and bra. Except for socks on the feet, the body was nude from the waist down. A pair of rust colored pants and pink panties lay on or next to the body and her shoes had been placed beside each knee. The garments found with the body matched those Roxanne had worn the night of 27 February. Frankie Harris testified that she had been fully clothed the last time he saw her. Dr. William Elliott, a pathologist who performed the autopsy on the body, testified that it had been in the ground several weeks when it was found.

TBI agent Wayne Atkins and Deputy Joe Graves of the Monroe County Sheriff's Department went to North Carolina to talk with

---

**3.** Jeff Mobley, who had been 10-years-old in 1978 and had lived at the house on Old Furnace Road, testified that at the time of Roxanne's disappearance, around 2 or 3 days before any organized search began, three (3) men in a red or white car had stopped him around dusk while he was cutting wood outside the house and asked if he had seen a girl walking down the road. There was testimony at trial that hairs potentially

matching those of Roxanne Woodson were found in the trunk of a red Nova belonging to a friend of the defendant. Defendant had been driving a white Camero with a black metal top on the night of 27 February.

**4.** This was the incident leading to the aggravated assault conviction against defendant.

the defendant, who at first claimed someone had put the body where it was found to make him "look bad." Eventually, however, defendant admitted to burying Roxanne but not to killing her. He confessed that on the night of Roxanne's death he had gone back to the car to see if he could "get him some" while Frankie and Charles went to the bathroom. He said that Roxanne had relented and agreed to have sex with him and had started to pull down her pants but that he had decided he wanted nothing to do with her after "all the hassle he had been through." He claimed to have gotten out of the car to call for Frankie and Charles when Roxanne left the car and, after running about 8 or 10 feet, fell and hit her head "on a rock or something." He said that he checked for a pulse. (At this point the two (2) accounts of the defendant's statement disagree. Deputy Graves testified that defendant said he found no pulse in the victim. Agent Wayne Adkins related that defendant said he felt a pulse but could get no other response from her.) Defendant also claimed he had covered Roxanne's face and body with a blue jean jacket to keep her warm. He told the officers he had then run up and down the hill so he would appear breathless when he returned to the car where Frankie and Charles were. He related how he told the boys that Roxanne had become upset and run off, how they searched for the girl, and how he took Charles and Frankie home.

Defendant informed Adkins and Graves that he had returned to the mountain and once more checked Roxanne to see if she was alive. At that time he saw a small amount of blood on the right side of her face; and, although he could hear no heartbeat, he still tried to revive her by putting some water on her face. He then placed her in the car, drove to the Tellico River and tried again to revive her by washing her face with water. He next drove around Tellico looking for the Chief of Police. Finally he carried Roxanne to his house and tried to revive her by washing her face with alcohol. When there was no response, he decided to bury her. He dug a grave with a mattock and his hands. He

said that he had removed her pants. Her blouse was unbuttoned because he had decided to burn her clothes but then changed his mind. In the statement taken by Agent Adkins, defendant commented that "he was not sure but that victim Woodson could have been alive when he buried her." He told the officers that the blue jean jacket he had used to cover Roxanne should still be on the mountain and that he had thrown the mattock and the rag used to wipe Roxanne's face into the Tellico River. He admitted slapping her two or three times while they were in the car but said he was only playing with her. He also told the officers that after he received psychiatric treatment, he would tell them "how Roxanne really died."

Shepherd waived extradition and was returned to Tennessee. He escaped from the Bradley County Jail on 17 July 1978. Ten years later he was recaptured in London, Ontario, Canada, and was brought back to Tennessee in January 1990.

Roxanne Woodson's body was identified through the use of dental records. Dr. Elliott, the pathologist, testified he found no obvious cause of death. There was no sign of trauma to the body and no foreign object inside it. He noted that a blow to the head serious enough to cause death should have been detected in the autopsy but that signs of a less severe blow, sufficient only to render a victim unconscious, possibly could not have been seen during the examination. The cause of death most consistent with the physical findings was asphyxiation or suffocation. Evidence of hemorrhage in the larynx supported this theory. Strangulation was also a possible cause of death although he had found no fractures in the cartilage or bone of the neck to indicate that strangulation had occurred. When asked if it was possible that the victim had been buried alive, Dr. Elliott replied that he really did not know. The absence of dirt in the oral cavity or lungs indicated that this had not happened but, if the denim jacket had been placed over the face before dirt was put on the body, it would be unlikely that dirt would enter the oral cavity.

Dr. Elliott also testified that he found no evidence of sperm during the autopsy but indicated that over the period of time since death any sperm could have degenerated and become unrecognizable. There was no evidence of ingestion of drugs or alcohol, although low levels of acetone or ethanol were found. These were probably products of putrefactive changes. On cross-examination Dr. Elliott admitted that acetone might be a product of ingesting rubbing alcohol, which is potentially lethal, but affirmed on redirect that he saw no evidence that Roxanne had died from drinking rubbing alcohol.

Dr. Roger Myer, the clinical psychologist who had tested defendant, testified about the defendant's low IQ (88 in scholastic areas like reading and math, 82 on the performance portion of the test, with an average score of 88). Achievement tests placed him at the third grade level in reading and spelling and at the fifth grade level in math. Defendant had attended school only to the third grade. Dr. Myer testified that the defendant, the youngest of 11 children in an impoverished family, exhibited the guarded personality typical of the burned child syndrome, which is caused by being "emotionally put down as a child," poor and uneducated. Defendant was also a very dependent person and tested low in dominance; i.e., he would not be a leader. He did not have a sociopathic or antisocial personality disorder and was basically nonviolent. The defendant had been cooperative and not disruptive during his stay at the Middle Tennessee Mental Health Institute prior to trial. In 1976 and 1978, he had been treated for depression and anxiety.

The defendant also introduced several affidavits from people who had known him during his ten-year stay in Canada. These included the affidavits of: Leona Marian Dagenais, his common-law wife and the mother of his two children; June Hannon; Deveron George; Jessie Smith (recorded statement no affidavit); Dorothy Tripp; Bev Bennett; Sister Margaret Keller; and Joe Huber. The general import of these affidavits was that the defendant had been a good father, friend, neighbor and husband and had been nonviolent during the decade spent in Canada.

█ In protesting the sufficiency of the evidence, defendant contends that the State failed to establish the cause of death and failed to establish the corpus delicti; the State failed to establish that the defendant raped, attempted to rape or had the opportunity to rape the victim; and that the State's proof was unbelievable and contradictory.

█ The corpus delicti in a homicide case must be proven beyond a reasonable doubt before a defendant may be convicted. It consists of two (2) elements: (1) the death of a human being and (2) criminal agency in producing that death. While the corpus delicti cannot be established solely by the defendant's statements, any other statements may be considered along with any other evidence, both direct and circumstantial to prove the corpus delicti. *See State v. Shepherd*, 862 S.W.2d 557, 564 (Tenn.Cr.App. 1992). In homicide prosecutions it must be proved that death was not occasioned by natural causes, by accident, or by the deceased in person. *Davis v. State*, 1 Tenn.Cr. App. 479, 445 S.W.2d 933, 935 (1969).

There is evidence in this case that Roxanne Woodson was healthy at the time of her death. The proof also indicates that she was neither depressed or suicidal. Dr. Elliott testified that asphyxiation was "the most likely" cause of death and he found no indication of any natural cause of death. There was nothing found during the autopsy to indicate that Miss Woodson had accidentally struck her head. There was nothing discovered to support the theory that the acetone found in the victim's body could raise the inference that her death resulted from ingestion of alcohol. Dr. Elliott testified he discovered nothing to support that theory. There was evidence that Miss Woodson died of suffocation or asphyxiation, including defendant's own statement that she might have been alive at the time he buried her. His contradictory statements to officers, and his flight also support the finding that the victim died as the result of criminal agency.

■ The contention that the evidence was insufficient to prove the victim's death occurred during the perpetration or attempt to perpetrate rape also is without merit. Although there was no evidence of sperm or genital trauma, Dr. Elliott's testimony indicated any evidence of sperm could have degenerated and become unrecognizable over the period of time the body was buried. It is argued that defendant did not have sufficient opportunity to rape the victim in the short time (approximately five (5) minutes) while Frankie Harris and Charles Bovard were away from the automobile. The offense for which he was charged was murder in the perpetration of a rape or attempted rape. There was adequate evidence that he endeavored to persuade Roxanne Woodson to participate in a sexual act with him and that he attempted to use force to engage in that activity. This included the testimony of Charles Bovard that he heard a scuffle, grunt, or something under strain and heard her curse him, indicating a struggle between them. Moreover, the bloodhound traced the victim's scent from the place the car was parked to the brush pile, with a depression in it, approximately 100 yards from the car. The dog followed this trace three or four times and despite the efforts of its trainer, could not find her scent anywhere else within a two mile radius. Defendant told the police officers that he pretended she had run off into the woods when the two young boys returned to the car and found she was not there. Instead of raising an alarm, he told one of the boys to keep quiet about the incident and that he was going back to look for her again, and would bring her home. Defendant also relies on a recent unpublished decision of this Court, *State v. Dunn*, 1993 WL 339919 (Tenn. 9/7/93) to support his argument that the fact that the body was partially naked when buried was insufficient to establish she was killed during an attempted rape. *Dunn* is distinguishable from this case by the fact that the victim in *Dunn* had been engaging in voluntary sexual activities and ingestion of alcohol and drugs with the defendant at the time of her death.

Defendant argues that the State's proof contains a fatal contradiction because of Jeff Mobley's testimony that three men in a *red car* had asked if he had seen a girl and there was evidence that hair which might have come from Roxanne Woodson was found in the trunk of a red car owned by one of his friends. This car was later sold under suspicious circumstances. This evidence is not fatally contradictory of the State's proof. Mobley testified that the car was *red* or *white*. Frankie Harris and Charles Bovard testified that they and the defendant stopped at the house to ask if Roxanne had been seen. Roxanne's hair could have been found in the red car because it could have been the one used when defendant brought the body down the mountain at a later time. This was all proper evidence for the jury to consider and was sufficient to establish the conviction offense.

■ The evidence was sufficient to support the aggravated assault conviction. In 1978 the criminal statute proscribing aggravated assault provided in pertinent part that "any person who … attempts to cause or wilfully or knowingly causes bodily injury to another with a deadly weapon … is guilty of the offense of aggravated assault." T.C.A. § 39–601(b)(2) (Supp.1977). The evidence of defendant's obvious aggressive attitude in his bedroom while dressing, coupled with his confrontation of the officers with a loaded shotgun, was sufficient to establish that offense.

■ The issue is presented whether the evidence at trial was sufficient for a rational trier of fact to find defendant guilty beyond a reasonable doubt. A guilty verdict approved by the trial judge accredits the testimony of the State's witnesses and resolves all conflicts in the testimony in favor of the theory of the State. *State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn.1978). On appellate review the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn from it. *State v. Cabbage*, 571 S.W.2d 832, 836 (Tenn.1978). A verdict against the defendant removes the presumption of innocence and raises a presumption of

guilt on appeal. *State v. Grace,* 493 S.W.2d 474, 476 (Tenn.1978). A defendant has the burden of overcoming the presumption. *State v. Brown,* 551 S.W.2d 329, 331 (Tenn. 1977). Where the sufficiency of the evidence is challenged, the relevant question for the appellate court is whether, after reviewing evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 322–25, 99 S.Ct. 2781, 2791–92, 61 L.Ed.2d 560 (1979); T.R.A.P. 13(e).

There was evidence both circumstantial and direct in this case which the jury was entitled to believe. The defense proof was negligible. We affirm the judgment of the trial court at the guilt phase of the proceedings.

■ Defendant asserts that his statement to Officers Graves and Adkins should have been suppressed because it was involuntary and he did not waive his *Miranda* rights. He testified that the interrogation began around 3:30 a.m. and lasted until 3:00 p.m. that same day. His *Miranda* rights were read to him only toward the end of the interrogation at 1:30 or 2:30 p.m. He says that Adkins and District Attorney General Fisher had threatened to put his parents in jail, burn down his parents house and to take away his children. He also claimed that Fisher and/or Adkins had punched him in the stomach, grabbed him by the throat, and pushed him against the wall. It was only around noon, after he had been taken from the holding cell into a small office nearby that Fisher and Adkins "got calmed down a little."

District Attorney General Richard Fisher, TBI Agent Wayne Adkins, and Deputy Joe Graves of the Monroe County Sheriffs' Department testified that after traveling all night from Tennessee, they spoke with the defendant in a holding cell at the jail in Gastonia, North Carolina, beginning around 4:00 a.m. on Sunday, 9 April 1978. Defendant was given his *Miranda* rights at the

beginning of the interrogation. He acknowledged that he understood his rights, agreed to talk but refused to sign anything. Defendant told the officers that he had an attorney in North Carolina but did not need him present. Defendant appeared mentally alert and physically sound and was not under the influence of alcohol or drugs. Adkins asked questions while Graves took notes. General Fisher was in and out of the cell during the interview which lasted until approximately 11:00 a.m. or noon, with breaks for breakfast and trips to the bathroom. Defendant never requested that the questioning cease. All three men denied that any of them had physically abused the defendant or threatened his parents and children.

The trial court accredited the testimony of Graves, Adkins and Fisher and held that the "statements attributed to the defendant were not the product of physical abuse, fear, threats, intimidation, or coercion but instead, were freely, knowingly and voluntarily made after defendant had been fully advised of his *Miranda* rights. The evidence does not preponderate against the trial court's finding. We concur in that finding and hold that defendant's statements were admissible.

■ We find no merit in defendant's contention that the trial court erred in joining Counts 1 and 2 (first degree murder counts) with Count 9 (aggravated assault) for trial. Defendant was indicted in an 11 count indictment alleging the commission of several separate offenses during the years 1976–1978. Defendant moved to sever the offenses under Tenn.R.Crim.P. 8, 13 and 14. The trial court concluded in part, as is relevant to this case, that Tenn.R.Crim.P. 8(a) mandated the joinder of Count 9 with Counts 1 and 2 because the offense in Count 9 occurred during an investigation pertaining to Counts 1 and 2 and evidence pertaining to Count 9 would necessarily require proof pertaining to Counts 1 and 2. Despite the trial court's specific reference to Rule 8(a), defendant argues the issue under Tenn.R.Crim.P. 14(b)(1) which applies to severance of offenses joined for trial under Rule 8(b). Rule 14(b)(1) pro-

vides that where two (2) offenses have been joined or consolidated for trial under Rule 8(b), "the defendant shall have a right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others." Clearly, the trial judge was correct in his decision that Tenn. R.Crim.P. 8(a) applied in that the evidence of one offense was inextricably connected with the evidence in the other and there was no error.

Defendant poses error in denial of a motion to submit a written jury questionnaire to the prospective jurors. We rejected a similar issue in *State v. Smith,* 857 S.W.2d 1, 20 (Tenn.1993), finding it to be without merit. Defendant has failed to show prejudice resulting from the denial of this motion. He had the opportunity to and did ask prospective jurors some of the questions in the questionnaire.

■ Defendant complains of denial of a motion for investigative services pursuant to T.C.A. § 40–14–207(b) and *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). No particular need for investigative services was shown at the time the motion was heard by the trial court. The motion was denied because the public defender's office which represented the defendant had already received funding from the general assembly to hire an investigator. The public defender explained he had used these funds to hire a lawyer instead and there was no way this attorney could be asked to give up his other duties and investigate the case. Defendant argues he was entitled to an investigator because he was charged with other similar and interrelated offenses, including several rapes, kidnapping and, in particular the murder of Cathy Clowers, which could be used to establish an aggravating circumstance in this case. He argues that the fact that all of these offenses had occurred several years earlier made this a difficult case to investigate and that he needed expert assistance to investigate the cause of death and the circumstances of his 10 years residence

in Canada, the latter being a source of evidence of mitigating circumstances.

*Ake v. Oklahoma,* supra, 470 U.S. at 84, 105 S.Ct. at 1097, specifically held that when an indigent defendant makes a preliminary showing that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure him access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation and presentation of the defense. The holding in *Ake* is grounded in the Fourteenth Amendment's due process guarantee of fundamental fairness, assuring a criminal defendant a fair opportunity to present his defense.

■ Under *Ake* the indigent defendant must demonstrate before trial that expert assistance is necessary upon an issue likely to be significant at trial, and the burden is upon the defendant to show that the expert would be of material assistance in the establishment of his defense theory. *State v. Edwards,* 682 S.W.2d 682, 697 (Tenn.Cr.App. 1993). Something more than the general desire shown in this case to have an expert assist in some vague manner is necessary to establish the particularized need that must exist before a reversal is warranted. It must be observed that the trial court granted the motion as to the services of a psychologist who testified. Dr. Elliott's testimony regarding the cause of death was that of a competent, reliable and objective expert, see *State v. Evans,* 710 S.W.2d 530, 534 (Tenn. Cr.App.1985). The defense had a copy of the autopsy report; and funds were later authorized for counsel to travel to Ontario. The facts of this case do not show any violation of due process in the trial court's ruling on this issue.

■ Defendant protests admission of the evidence of the tracking by the bloodhounds searching for Roxanne Woodson. Evidence of trailing by bloodhounds is admissible where five (5) factors are established: (1) the pure blood of the dog; (2) the dog's proper training; (3) the dog's history of reliability;

(4) the dog's placement at a reliable point; and (5) trailing within a period of efficiency. *Copley v. State,* 153 Tenn. 189, 281 S.W. 460 (1926); *State v. Barger,* 612 S.W.2d 485, 491–92 (Tenn.Cr.App.1980).

We note in the first instance that, although defendant objected to the admission of the evidence at trial, no specific ground of his objection was made. The issue was not raised in the motion for new trial and for these reasons must be considered waived. Otherwise, there is no merit to the complaint. The State proved each of the five (5) criteria necessary to establish a foundation for the dog tracing evidence.

■ Defendant says the trial court erred in failing to sequester the jury after it had been selected the day before trial began when jurors were selected from Coffee County and were transported the next day to Bradley County for trial. The trial court granted defendant's motion for change of venue by utilizing the procedure recently approved by this Court in *State v. Nichols,* 877 S.W.2d 722 (Tenn.1994). The trial judge moved jury selection to Coffee County, and upon its conclusion, transported the selected jurors back to Bradley County for trial. The jurors apparently were not sworn in until they were brought to Bradley County. Defendant did not object to this procedure. Defendant unsuccessfully requested that those jurors who had been tentatively selected be sequestered during voir dire and prior to the jury's being sworn at the beginning of trial. A trial judge has the discretion to allow the separation of tentatively selected jurors, with appropriate admonitions, until they are sworn, in both capital and non-capital felony cases. *State v. McKay,* 680 S.W.2d 447, 452–453 (Tenn.1984). Defendant has not shown that the trial court abused its discretion, that jury misconduct occurred, or that the failure to sequester the jury before they were sworn prejudiced him in any manner. The issue is without merit. *See State v. Black,* 815 S.W.2d 166, 180 (Tenn.1991).

■ Defendant inquires whether, in both the guilt phase and the sentencing phase of the trial the District Attorney made improper and inflammatory remarks not based on the evidence. Insofar as the guilt phase of the proceedings is concerned, defendant complains of four (4) comments made by State's counsel in the course of argument. The first is the prosecutor's argument in reference to the aggravated assault charge when he said, inter alia, that the evidence was uncontroverted that defendant pulled a shotgun and aimed it at the two (2) police officers. The State acknowledged that there was no testimony that defendant *pointed* the shotgun at the two (2) officers. Objection to the State's argument was overruled without curative instructions. The trial judge did properly instruct the jury that a defendant need only display a weapon to warrant an aggravated assault conviction. We have found the evidence sufficient to sustain the conviction. Any error which may have occurred was harmless beyond a reasonable doubt.

■ The three (3) remaining remarks of which defendant complains were all either supported by the evidence or permissible inferences from the evidence. He complains the District Attorney referred to suffocation or strangulation as "the most likely cause of death." The testimony of Dr. Elliott supported this argument, which was also a logical inference from the results of the autopsy and the medical proof. The medical proof also supported the prosecutor's statement "that the toxicology report showed no evidence of pills in Roxanne Woodson's body." Finally, he complains of the prosecutor's argument that the defendant "theoretically, came back up there after he took the boys home and had sex with her, and/or killed her." This argument was based upon reasonable inferences from the evidence adduced at trial and was not improper. *See State v. Sutton,* 562 S.W.2d 820, 826 (Tenn. 1978).

■ Prior to entering into consideration of the issues for error raised at the sentencing phase of the trial, we find it necessary to discuss a matter which was raised at oral argument before this Court when the State

Attorney General made the concession that the defendant should receive a life sentence. The exact terminology employed by the Attorney General is unclear because the tape recording of the argument is not intelligible at that phase of the argument. It is plain that he did not inform the Court of the reason for the State's concession and there is no error apparent in the record that would make the defendant ineligible for the death penalty as a matter of law. Under the legislative framework provided for death penalty review, T.C.A. § 39–13–206(d)(2) vests the authority in this Court to modify a sentence of death to life imprisonment, however, no restrictions are placed on this authority under the statute other than the presumption that the court will act within its jurisdiction and upon valid principles of law. We find no legal basis in this record for outright modification of the sentence to life. The authority vests in the Court under the statute and is not the prerogative of the Attorney General. If the State's reason was based upon some legal authority, that authority should have been presented to the Court at oral argument. If some factual matter outside the record lies at the root of the State's request, any action on the part of the Court would be dictated by the fact that this Court has appellate jurisdiction only and it would be inappropriate for it to decide matters outside the record that have not been presented to an inferior court. See Article VI, Sec. 2 of the Tennessee Constitution and T.C.A. § 16–3–201(a) (Supp.1993). At any rate, it is not a matter for the attorney general's decision, such action is purely within the province of the Court. *See Pace v. State,* 566 S.W.2d 861 (Tenn.1978); *State v. Hodges,* 815 S.W.2d 151, 155 (Tenn.1991); *Williams v. State,* 491 S.W.2d 862, 867 (Tenn.1972).

We now move to the issues raised at the sentencing phase of this proceeding. The State submitted three (3) aggravating circumstances in this case:

(A) Previous conviction of a felony involving violence to the person, T.C.A. § – 2404(i)(2) (Supp.1977) [T.C.A. § 39–13–204(i)(2) ].

(B) The murder was especially Heinous, Atrocious or Cruel, T.C.A. § 39–2404(i)(5) (Supp.1977) [T.C.A. § 39–13–204(i)(5) ].

(C) Murder committed during the commission of felony, T.C.A. § 39–2404(i)(7) (Supp.1977) [T.C.A. § 39–13–204(i)(7) ].

■ In reference to the previous conviction of a felony involving violence to the person, the State depended on the conviction for the second degree murder of Cathy Clowers. This conviction was reversed in October 1992 by the Court of Criminal Appeals and remanded for a new trial. *See State v. Joe Shepherd,* 862 S.W.2d 557 (Tenn.Cr.App. 1992). This Court denied the State's application for permission to appeal on 22 March 1993.

The State acknowledges that this Court's decision in *State v. Middlebrooks,* 840 S.W.2d 317 (Tenn.1992), has eliminated the felony murder enhancement factor as a facet of the sentencing procedure.

■ Defendant argues that the evidence is insufficient to establish the heinous, atrocious, or cruel aggravating circumstances under the definitions set forth in *State v. Williams,* 690 S.W.2d 517 (Tenn.1985). Relying on *State v. Johnson,* 743 S.W.2d 154 (Tenn.1987), the State argued that a murder perpetrated by suffocation of the victim over a period of four (4) minutes is sufficient to support this aggravating factor. The evidence of suffocation in *Johnson* was much more definite than we find in this case. It was clear that the victim in that case was conscious as she suffocated after her husband forced a large plastic bag down her throat. However, in this case there is proof that the victim suffocated after being buried alive. Such circumstances would warrant the jury making a finding of torture and depravity.

In *Johnson v. Mississippi,* 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), the United States Supreme Court held that a death penalty based in part on a vacated conviction violated the Eighth Amendment prohibition against cruel and unusual punishment. The Tennessee Supreme Court has

held that the felony murder aggravating circumstance cannot stand. While under some circumstances this error might be found to be harmless, see *State v. Howell*, 868 S.W.2d 238, 259–262 (Tenn.1993), we conclude we have no alternative in this case to remanding for resentencing. Of course, the aggravating circumstance of a previous conviction of a felony involving violence may be reinstated in the event of retrial and conviction of defendant for the homicide of Kathy Clowers.[5] Potentially, substantial proof of mitigating circumstances relative to defendant's character during the 10 years following this offense was presented at trial. The cumulative error of finding two (2) invalid aggravators in the face of what could be considered substantial mitigating proof militates against a finding of harmless error in this case.

We note that the jury verdict form reported that the jury found that "the murder was committed while the defendant was engaged in committing, or was attempting to commit, or was fleeing after committing or attempting to commit, any *first degree murder*, rape or kidnapping." This was an erroneous finding. There is no evidence in this record to establish that the victim's murder occurred in connection with another first degree murder. *See State v. Pritchett*, 621 S.W.2d 127, 140 (Tenn.1981).

Defendant makes a generalized attack on the death penalty and on Tennessee's statutory scheme for imposing capital punishment, the elements of which are essentially identical to arguments repeatedly rejected by this Court in earlier opinions. *See State v. Black*, 815 S.W.2d 166 (Tenn.1991); *State v. Brimmer*, 876 S.W.2d 75 (Tenn.1994); *State v. Cazes*, 875 S.W.2d 253 (Tenn.1994). Therefore, we reject defendant's argument that T.C.A. § 39–13–204 and § 39–13–206 violate the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and Article I, Secs. 8, 9, 16 and 17, and Article II, Sec. 2 of the Tennessee Constitution. We observe that defendant challenges

the foregoing statutes as codified pursuant to the 1989 Criminal Code Revision. The jury charge at the sentencing hearing appears to have been omitted from the record, we point out that defendant should have been sentenced under the capital sentencing structure as codified at the time of the offense in 1978. *See State v. Brimmer*, supra.

Defendant's complaint that the statute fails to meaningfully narrow the class of death eligible defendants was rejected in *State v. Black*, supra. This Court has held repeatedly that the death sentence under the Tennessee Statutory scheme is not imposed capriciously and arbitrarily. *State v. Black*, supra. *State v. Teel*, 793 S.W.2d 236 (Tenn. 1990).

This Court has held that prosecutorial discretion in determining which cases to seek the death penalty does not violate the Eighth Amendment by allowing arbitrary and capricious imposition of the death penalty. *State v. Brimmer*, supra, *State v. Cazes*, supra. Although the decision to prosecute is subject to certain constitutional restraints such as due process and equal protection, *Cooper v. State*, 847 S.W.2d 521, 536–538 (Tenn.Cr.App. 1992), the defendant neither charges nor has shown any such constitutional violations in this case. There has been no showing that the decision to seek the death penalty in his case was arbitrary or capricious. *McCleskey v. Kemp*, 481 U.S. 279, 293, 107 S.Ct. 1756, 1767, 95 L.Ed.2d 262 (1987).

Defendant's complaint concerning prosecutorial argument at the sentencing phase involves a remark made in the context of the State's argument to the effect that if the jurors ever read of defendant's execution at some future date, they would remember that they had sentenced him according to the law and not arbitrarily "killed" him as defense counsel had argued. State's counsel went on to refer the jury's attention to victim's Roxanne Woodson and Kathy Clowers, and their families. Such victim-impact argu-

---

5. The Court has been informed that the Clowers homicide case is being held in abeyance pending the outcome of the decision in this case.

ment is not improper. *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *State v. Payne,* 791 S.W.2d 10, 17–19 (Tenn.1990). The State argues that the comments were intended to remind the jury to consider the aggravating circumstances in the case. We caution the State to utilize such arguments advisedly.

We affirm defendant's conviction. We find the various issues raised by defendant at sentencing to be without merit and remand the case for resentencing as set forth heretofore. The felony murder aggravating circumstance will not be utilized. Costs are taxed against defendant.

ANDERSON, C.J., and DROWOTA, J., concur.

REID and BIRCH, JJ., dissent. See separate opinions.

BIRCH, Justice, dissenting.

I write separately to join the dissent insofar as it condemns the method by which the venire was assembled. Such a practice as was employed here invites abuse through the subjective and often obscure criteria upon which such a method may depend. I would reverse the judgment and grant a new trial on this issue alone.

REID, Justice, dissenting.

I dissent from both the majority's affirmance of the conviction and its remand for re-sentencing. I would reverse the conviction. In the alternative, I would hold that the death penalty is foreclosed as punishment in this case.

First, for the reasons stated in my dissent in *State v. Nichols,* 877 S.W.2d 722, 740 (Tenn.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995), I would hold that the conviction must be reversed because of the procedure used by the trial court in response to the defendant's motion for a change of venue. As in *Nichols,* rather than granting the motion in accord with the procedure authorized by statute, Tenn.Code Ann. § 20-4-206 (1994), the court moved jury selection to another county and, after selection was completed, transported the jury back to the county of the offense where the rest of the trial was held. This was not a change of venue but a change of venire, a procedure unknown to Tennessee. The actions of the trial court were an "unauthorized departure from the plain provisions of the statute" and reversible error. *Nichols,* 877 S.W.2d at 740. Furthermore, I do not find that the defendant's failure to object to the procedure used by the trial court insulates such extralegal procedures from this Court's review. *See* Tenn.R.App.P. 13(b); Tenn.R.Crim.P. 52(b).

The issue is trial by jury. Since the Magna Carta was sealed by the King of England in 1215, the dependency of democracy and freedom upon the trial by jury has been recognized by poets, statesmen, judges, and others in eloquent and passionate terms. Perhaps the simple words of Judge Alexander Hanson of Maryland state the truth as well as any.

> The institution of the trial by jury has been sanctified by the experience of ages. It has been recognized by the constitution of every state in the Union. It is deemed the birthright of Americans; and it is deemed, that liberty cannot subsist without it. . . .

1 J. Kendall Few, *In Defense of Trial by Jury,* 210 (1993) (quote from Judge Alexander Hanson in *Address on the Proposed Plan of a Federal Government, 1788* as quoted by Bernard Schwartz in 3 *The Roots of the Bill of Rights: An Illustrated Source Book of American Freedom,* 540–542 (Chelsea House Publishers 1980)).

If the right to trial by jury should ever be lost, as tragically it may, it will not be accomplished directly by constitutional convention and a vote of the people; it will occur, not secretly but silently, without notice or public debate. Judges, with the best of intentions and with laudable purpose, will allow this bedrock of liberty to be dismantled piece-

0

meal, and note its passing with the inglorious "harmless error." Preservation of trial by jury, in all its profoundness and simplicity, is the essential duty of this Court.

In this case, the Court has failed that duty, by allowing a seemingly unnecessary part of trial by jury to be sacrificed for the sake of economy and convenience. This case will become precedent and the next encroachment has been made easier.

For this reason, I would reverse the defendant's conviction and remand for a new trial.

Second, I reaffirm my opinion that, at least in part, the aggravating circumstance in Tenn.Code Ann. § 39–2404(i)(5) (Supp.1977), prior to the amendment in 1989, see Tenn. Code Ann. § 39–13–204(i)(5), the "murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind," is unconstitutionally vague as defined by this Court and as instructed to juries in this state. See, e.g., State v. Cazes, 875 S.W.2d 253, 272 (Tenn.1994) (Reid, C.J., concurring and dissenting); State v. Van Tran, 864 S.W.2d 465, 487–489 (Tenn.1993) (Daughtrey, J., dissenting), cert. denied, — U.S. —, 114 S.Ct. 1577, 128 L.Ed.2d 220 (1994); State v. Harris, 839 S.W.2d 54, 83–84 (Tenn.1992) (Reid, C.J., dissenting), cert. denied, — U.S. —, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993); State v. Black, 815 S.W.2d 166, 195–196 (Tenn.1991) (Reid, C.J., dissenting).

As stated in prior dissents, the words "heinous, atrocious or cruel" are so bereft of particular meaning that this aggravating circumstance does not accomplish the constitutional mandate of directing and limiting the jury's discretion "so as to minimize the risk of wholly arbitrary and capricious action." Gregg v. Georgia, 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976); see State v. Black, 815 S.W.2d 166, 195 (Tenn.1991). The precariousness of the Court's persistent reliance upon this patently invalid aggravating circumstance is indicated by the opinion of Justice Stevens in Barber v. Tennessee, — U.S. —, 115 S.Ct. 1177, 130 L.Ed.2d

1129 (1995). In denying the capital defendant's petition for certiorari from the judgment of this Court denying post-conviction relief,[1] Justice Stevens stated:

On occasion it is appropriate to restate the settled proposition that this Court's denial of certiorari does not constitute a ruling on the merits. United States v. Carver, 260 U.S. 482, 490 [43 S.Ct. 181, 182, 67 L.Ed. 361] (1923). See also Singleton v. Commissioner, 439 U.S. 940, 942–946 [99 S.Ct. 335, 337–339, 58 L.Ed.2d 335] (1978) (opinion of Stevens, J., respecting the denial of the petition for writ of certiorari). In this case, for example, there are valid reasons for the Court's decision to deny review. But this does not mean petitioner's challenge to his death sentence, based in part upon the trial judge's definition of an aggravating circumstance, lacks merit. Under the trial court's instruction, a jury could find an aggravating circumstance sufficient to impose the death penalty merely by concluding that a murderer's state of mind was "wicked or morally corrupt." Because such a state of mind is a characteristic of every murder, the instruction is plainly impermissible under this Court's holdings in Godfrey v. Georgia, 446 U.S. 420, 428–429 [100 S.Ct. 1759, 1764–65, 64 L.Ed.2d 398] (1980) (striking down instruction allowing jury to find aggravating circumstance if murder was " 'outrageously or wantonly vile, horrible and inhuman' "), and Maynard v. Cartwright, 486 U.S. 356, 363–364 [108 S.Ct. 1853, 1858, 100 L.Ed.2d 372] (1988) (" 'especially heinous, atrocious, or cruel' ").

Id.

I would hold this aggravating circumstance to be invalid.

Even were I convinced of the constitutionality of this aggravating circumstance, in the present case I find the evidence insufficient to support a finding that the murder was "especially heinous, atrocious, or cruel." It is the State's burden to prove beyond a reasonable doubt the aggravating circum-

1. Barber v. State, 889 S.W.2d 185 (Tenn.1994).

stances upon which it relies before a defendant may be sentenced to death. *See* Tenn. Code Ann. § 39–2404(g) [now Tenn.Code Ann. § 39–13–204(g)(1)(A) ]. To prove the aggravating circumstance in § 39–2404(i)(5), the State must present evidence that the murder involved torture or depravity of mind. To do this, there must be proof of the willful infliction of severe physical or mental pain upon the victim while he or she was alive and conscious, *see State v. Williams*, 690 S.W.2d 517, 529 (Tenn.1985), or of the infliction of gratuitous and senseless violence on a helpless victim. *See State v. Van Tran*, 864 S.W.2d at 479–480. Failing this, the proof is insufficient to support this aggravating circumstance.

The record in this case shows that, almost immediately after the defendant attempted to coerce the victim into having sexual relations with him, the victim disappeared. Approximately a month and a half later the victim's body was found buried in a shallow grave near the house where the defendant lived. There was no sign of trauma to the body and no physical evidence of strangulation. The pathologist who had examined the body admitted that he had found no obvious cause of death. Nonetheless, he theorized that suffocation or asphyxiation was the cause of death most consistent with the physical findings, which included evidence of hemorrhaging in the larynx. The pathologist admitted that he did not know whether the victim had been buried alive and testified that the absence of dirt in her mouth and lungs indicated that she had not been alive when buried. He also opined that dirt might not have entered the oral cavity if a denim jacket, like that found with the victim, had been placed over her face before she was buried.

From this, the majority finds the evidence sufficient to support the heinous, atrocious or cruel aggravating circumstance because there is proof that the victim suffocated after being buried alive. However, this conclusion is based only on speculation. The actual evidence establishes nothing more than that the cause of death cannot be determined.

The circumstances of the victim's death, such as whether she was conscious when buried and whether the defendant willfully placed her alive in the grave, are unknown. Furthermore, the critical inquiry in determining depravity is the murderer's state of mind at the time of the killing, *State v. Van Tran*, 864 S.W.2d at 479; yet there is not one scintilla of evidence in this record regarding the defendant's mental state at the time the victim was killed. As a result, the proof falls far short of that necessary to establish beyond a reasonable doubt that the murder involved torture or depravity of mind.

With the invalidation of the aggravating circumstance in Tenn.Code Ann. § 39–2404(i)(5), no aggravating circumstance remains upon which a sentence of death may be based. Under the facts of this case, I would therefore modify the sentence to life imprisonment pursuant to Tenn.Code Ann. § 39–13–206(d)(2), as suggested by the Attorney General in oral argument.

In this regard, while I concur with the majority that the State's concession that the defendant should be sentenced to life is not binding on this Court, I would emphasize that the Attorney General has concluded that life imprisonment is the proportionate punishment for this defendant. This recommendation is extraordinary and, to my knowledge, unprecedented in a capital case. Such a concession, while not dispositive of the issue, should carry great weight with this Court.

In light of the entire record in this cause, I would find that, even were the defendant properly convicted of the first degree murder of Roxanne Woodson, the only permissible punishment under the law is life imprisonment.