# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT KNOXVILLE

### JANUARY 1999 SESSION

FILED

July 21, 1999

Cecil Crowson, Jr.
Appellate Court
Clerk

| | | |
|---|---|---|
| **KENNETH ALAN STEELE,** | * | C.C.A. No. 03C01-9701-CR-00012 |
| Appellant, | * | HAMILTON COUNTY |
| vs. | * | Hon. Douglas A. Meyer, Judge |
| **STATE OF TENNESSEE,** | * | (Post-Conviction) |
| Appellee. | * | |

For Appellant:

Donna Robinson Miller
Assistant District Public Defender
701 Cherry Street, Suite 300
Chattanooga, TN  37402

For Appellee:

John Knox Walkup
Attorney General and Reporter
425 Fifth Avenue North
Nashville, TN  37243-0493

Todd R. Kelley
Assistant Attorney General
Criminal Justice Division
425 Fifth Avenue North
Nashville, TN  37243-0493

C. Leland Davis
Assistant District Attorney General
600 Market Street, Suite 300
Chattanooga, TN  37402

OPINION FILED: _____

AFFIRMED

NORMA MCGEE OGLE, JUDGE

# OPINION

The petitioner, Kenneth Alan Steele, appeals the Hamilton County Criminal Court's denial of post-conviction relief. On appeal, the petitioner presents the following issues for our consideration:

1. Whether the petitioner received ineffective assistance of counsel at trial and on direct appeal, including counsel's failure on direct appeal to challenge the sufficiency of the evidence supporting all of the petitioner's convictions;

2. Whether the evidence at trial was sufficient to support all of the petitioner's convictions and whether this court denied the petitioner due process by failing to review the sufficiency of the evidence sua sponte on direct appeal;

3. Whether the trial court denied the petitioner due process of law by refusing to provide the petitioner a DNA expert;

4. Whether the trial court denied the petitioner due process of law by admitting DNA and fingerprint evidence;

5. Whether the trial court denied the petitioner due process of law by admitting testimony concerning the show-up identification of the petitioner; and

6. Whether the trial court denied the petitioner due process of law in instructing the jury on reasonable doubt.

Following a thorough review of the record and the parties' briefs, we affirm the judgment of the post-conviction court.[1]

## I. Factual Background

### A. Trial Proceedings

On October 15, 1991, the petitioner's case proceeded to trial in the Hamilton County Criminal Court on twenty-one separate indictments involving eight different incidents with eight victims. The offenses spanned a period of time from

---

[1] The petitioner also alleges in his brief that he was denied the effective assistance of counsel and due process of law by his counsel's failure on direct appeal to timely submit an application for permission to appeal to the supreme court. As noted later in this opinion, this court has already addressed this complaint and provided appropriate relief.

1987 until 1990. State v. Steele, No. 03C01-9207-CR-233, 1993 WL 415836, at *1 (Tenn. Crim. App. at Knoxville, October 13, 1993). The jury returned guilty verdicts on all twenty-one indictments, and, on January 31, 1992, the petitioner was convicted of the following offenses:

1.	In cases No. 188342 and No. 188345, first degree burglary and aggravated rape of PM[2] on November 17, 1987.[3]

2.	In cases No. 188334, No. 188332, and No. 188333, first degree burglary, armed robbery, and aggravated rape of CM on January 3, 1988.

3.	In cases No. 188337, No. 188336, and No. 188335, first degree burglary, attempt to commit armed robbery, and assault with intent to commit rape of EP on July 26, 1989.

4.	In cases No. 188340, No. 188338, and No. 188339, first degree burglary, armed robbery, and aggravated assault of DM on July 26, 1989.

5.	In cases No. 188330, No. 188329, and No. 188331, first degree burglary, armed robbery, and aggravated rape of ES on October 8, 1989.

6.	In case No. 188341, aggravated burglary of SB's home on January 21, 1990.

7.	In cases No. 188343, No. 188328, and No. 188344, aggravated burglary, aggravated robbery, and attempted rape of SS on June 24, 1990.

8.	In cases No. 188327, No. 188325, and No. 188326, aggravated burglary, theft of property, and rape of JP on

---

[2]Pursuant to this Court's policy, the victim will be referred to only by her initials.

[3]We note that the judgment form in case No. 188342 does not name the offense of which the petitioner was convicted. The trial transcript reflects that the jury found the petitioner guilty of first degree burglary.

June 30, 1990.[4]

The trial court imposed an effective sentence of one hundred and sixty-five years (165) in the Tennessee Department of Correction.[5]

On direct appeal, this court briefly summarized the facts adduced at trial:

> [T]he record reveals that the appellant's various offenses were part of a common scheme or plan to burglarize, rob and rape single women who lived within walking distance of the place where he worked. The offenses had several distinctive characteristics. In each case, the victims lived in the ground floor of an apartment or duplex and the appellant entered through a glass window, although in one case he entered through a glass patio door. The appellant did not enter any residence by breaking open a front or back door. The appellant selected victims who did not have a man or other adult at home. In each case, the victims lived alone or with their children.
>
> The appellant committed similar crimes against each victim. He was convicted of burglary of every victim's home. He was convicted of robbery or armed robbery of five victims. He was convicted of rape or a derivative offense such as attempted rape of six victims. Some of the offenses had additional characteristics which made them particularly unusual. For example, most of the victims reported that the appellant used a towel to cover his face or that of his victim when he raped them.

Steele, No. 03C01-9207-CR-233, 1993 WL 415836, at *1.

---

[4]The judgment form for the petitioner's conviction of rape in case No. 188326 reflects that the date of the offense was June 30, 1991. The indictment, however, reflects a date of June 30, 1990. Moreover, the victim testified during trial that the rape occurred on June 30, 1990. When there is a conflict between the judgment and the transcript, the transcript controls. State v. Moore, 814 S.W.2d 381, 383 (Tenn. Crim. App. 1991); Currie v. State, No. 02C01-9701-CC-00047, 1998 WL 32684, at *2 (Tenn. Crim. App. at Jackson), perm. to appeal denied, (Tenn. 1998).

[5]We note that the judgment form for the petitioner's aggravated rape conviction in case No. 188333 reflects an original sentence of eight years in the Department of Correction. However, the transcript of the sentencing hearing reflects that the trial court imposed a sentence of twenty-five years. As noted above, when there is a conflict between the judgment and the transcript, the transcript controls. Moore, 814 S.W.2d at 383; Currie, No. 02C01-9701-CC-00047, 1998 WL 32684, at *2. In any case, on direct appeal, this court reduced the petitioner's sentence in that case to sixteen years incarceration in the Department.

4

The transcript of the trial proceedings includes the following testimony. PM testified that on November 17, 1987, she was living with her son in a duplex in the Avondale area of Chattanooga. She had locked the doors and gone to bed when she was awakened by "pats" on her chest. The room was very dark, but she was able to discern a man standing above her. He was holding a knife in his hand and threatened to cut her throat if she did not remain silent. He then ordered her to remove her clothing and proceeded to rape her. PM's assailant then inquired if she had a gun or money. She removed money from her purse and surrendered it to the man. Despite the darkness, PM was able to describe the man as black, with an average build, approximately five feet and ten inches tall, wearing pants, a shirt, and a towel around his head and face. Despite the towel, she was able to see that he had a "close haircut." He also appeared to be left-handed. Finally, she stated that he smelled as if he worked in a gas station. Following the assault, the intruder left the bedroom, indicating that he was "going to take a piss," and would return. PM remained in the bedroom until she was reasonably certain that he had departed her home.[6]

CM testified that on January 3, 1988, she was living with her son in a duplex in Chattanooga. The State's proof revealed that CM's duplex was located in an area in which the police were investigating activities by an unknown individual referred to at that time as the "towel rapist." On the night in question, CM was sleeping with her son when she was awakened by a man placing his hand over her mouth and nose. The man threatened to hurt her son if she did not get up from the bed. Her assailant then forced her down the hallway into the living room, where he raped her. The man was armed with a knife and held the knife to her throat during

---

[6]Again, with respect to PM, the petitioner was convicted of first degree burglary and aggravated rape.

the assault. Her house was dark, but CM was able to describe her assailant as black, neither fat nor thin, with very little hair or no hair. CM further recalled that, when standing, her head was at the same level as his chest. She testified that she is five feet and one inch tall. She remembered that her assailant was holding the knife in his left hand. Finally, CM stated that the assailant left grease marks with his hands on the wall of her apartment.

Following the rape, CM's assailant threatened to hurt her or her son if she did not remain still. He then left the living room, and CM heard him removing coins from a can she kept in another room. She subsequently discovered that several silver coins and a camera were missing from her home.[7]

EP testified that on July 26, 1989, she was living with her daughter in a duplex in the Avondale area of Chattanooga. She had gone to bed when she was awakened by a man placing his hand over her mouth. He threatened to hurt her or her child if she screamed. She felt a sharp object against her neck. He told her he was going to "f---" her and then inquired if she had any money. When she told him she did not have money and showed him her empty purse, he began to touch her and remove her clothing. EP informed him that she is disabled and that her legs "were not for doing anything like this." When the man felt her legs, he ceased his assault, apologized, and left. Although the house was very dark, EP was able to testify that the man was approximately five feet and seven or nine inches tall, his body felt heavy on top of hers, and he was wearing "cloth or something" on his head.[8]

---

[7]As noted above, with respect to CM, the petitioner was convicted of first degree burglary, armed robbery, and aggravated rape.

[8]As to EP, the petitioner was convicted of first degree burglary, attempt to commit armed robbery, and assault with intent to commit rape.

6

DM testified that, on July 26, 1989, she was living with her husband and three children in a duplex in the Avondale area of Chattanooga. Testimony at trial revealed that her residence was no more than six blocks from EP's home. DM's husband was a truck driver and was away from home for long periods of time. He was away from home on the night in question. DM had gone to sleep when she was awakened by a man standing next to her bed. He immediately "straddled" her on the bed, and she began to struggle. She testified, "I was really fighting and screaming real loud. ... seems like they had something over my face, I can't remember, I don't know. But whoever it was hit me in my eye and then they ran." DM subsequently discovered a butcher knife from her kitchen in her bed. She testified that, when she had gone to sleep that night, the knife had been in her kitchen. DM also discovered that a rifle was missing from her home. At the time of the assault, DM's house was dark, but she was able to describe her assailant as five feet and eight inches tall, with a medium build. According to DM, he "didn't have that much hair." She also recalled that her assailant did not appear to be wearing a shirt.[9]

ES testified that on October 8, 1989, she was living with her two daughters in a duplex in Chattanooga. The State established that the duplex was located in the same area in which the so called "towel rapist" was operating. ES had gone to bed and was awakened when the door to her bedroom opened. The intruder immediately threatened to kill her if she did not remain silent. He ordered her to remove her clothes and then raped her. During the assault, the assailant held a "box cutter" to her throat. Afterwards, he asked if she had money. When she indicated that she did not, he left the bedroom. He told her that he would kill her if

---

[9]Again, with respect to DM, the petitioner was convicted of first degree burglary, armed robbery, and aggravated assault.

she called the police. Although her house was dark, DM was able to testify that her assailant was a black man with an average height and medium build and was wearing a towel on his head. She further testified that the assailant had "average" hair, similar to the petitioner's hair at trial. Following the incident, she discovered that her child's piggy bank, filled with pennies, had been removed from the house and left outside.[10]

SB testified that on January 21, 1990, she was living by herself in a duplex in Chattanooga. She had gone to her bedroom and was watching the television. She had locked the door to her bedroom and had placed her telephone in the bed with her. At some point, she heard a noise in the hallway. She immediately called the police. The police arrived in approximately five minutes. At that time, she noticed that a "ceramic dog bank," filled with Canadian money, was missing from her home. SB never saw the intruder. However, she testified that she recognized the petitioner at trial, because he lived in the same neighborhood.[11]

SS testified that on June 24, 1990, she was living with her two daughters in a duplex in the Avondale area of Chattanooga. She had gone to sleep when she was awakened by a man holding his hand over her mouth and pressing a screw driver to her neck. Her assailant told her that he would not harm her if she remained silent. He asked if she had any money. She informed him that she had $75.00 in another room. At that point, he began to fondle her and tried to remove her pants. SS grabbed the screw driver and stabbed him twice close to the collarbone. She did not observe any blood. She stated, "I felt like I hit him enough

_____

[10]As to ES, the petitioner was convicted of first degree burglary, armed robbery, and aggravated rape.

[11]The petitioner was convicted of the aggravated burglary of SB's home.

8

to, you know, kinda hurt him a little but not too much." SS then began screaming, and her assailant ran out of the bedroom. Although her house was dark, SS was able to describe her assailant as a black man with short hair. He was wearing "some kind of cap on his head." He was taller than she was and had a medium build. He was wearing pants but did not appear to be wearing a shirt. Subsequently, she discovered that the intruder had taken approximately fifteen dollars and some jewelry from her home.[12]

Finally, JP testified that on June 30, 1990, she lived with her daughter in a home in the Avondale area of Chattanooga. She had gone to her bedroom to watch television when she heard a noise. She was leaving her bedroom to investigate when "this thing came over my head." A man pushed her back into her bedroom and told her that he would "cut" her if she did not remain silent. He asked if she had any money, and she gave him one hundred and fifty dollars. He also retrieved some jewelry from her dresser. The intruder warned JP not to remove the cloth from her head, but she raised the cloth a small amount and was able to see him. She testified that there was enough light to see her assailant. Her assailant, however, was not aware that she could see him and proceeded to rape her. She observed him closely for approximately five minutes. She described her assailant as a black man with a receding hairline. He was wearing a dark blue or black work uniform with a white and red name tag. However, she could not discern the name on the tag. As he was leaving the bedroom, he asked her if she had a gun. When she told him that she did not, he ordered her to remain still and indicated that he was going "to take a pee." The intruder did not return. JP testified that soon after the incident, on the same day, she positively identified the petitioner during a show-

---

[12]As noted earlier, with respect to SS, the petitioner was convicted of aggravated burglary, aggravated robbery, and attempted rape.

up identification procedure at the hospital. She also positively identified the petitioner at trial, and confirmed that the clothing removed from the petitioner following his arrest was the same clothing worn by her assailant.[13]

Harold Jackson, Jr., an officer with the Chattanooga Police Department, testified that he was en route to JP's residence on June 30, 1990, when he observed the petitioner running down the street four or five blocks from JP's home. The police subsequently determined that the petitioner matched JP's description of her assailant, and the police apprehended the petitioner one half of a mile from JP's home. The petitioner was wearing blue work clothes with a name tag trimmed in red. The State's proof revealed that, at the time of his arrest, the petitioner worked at an automobile parts business. The police determined that he both worked and lived in the vicinity of all eight incidents. Moreover, at the time of his arrest, the petitioner had two small scars on his upper torso near the collar bone. Finally, Larry Swafford, an officer with the Chattanooga Police Department, testified that the petitioner is left-handed.

William Van Atta, a fingerprint specialist with the Federal Bureau of Investigation, testified that latent fingerprints or palm prints were recovered from the scenes of all eight incidents. A total of twenty-six latent fingerprints and four latent palm prints matched those of the petitioner. Agent Van Atta opined that there was no possibility that the fingerprints and palm prints could have been left by someone other than the petitioner.

Pattie Choatie, a serologist with the Tennessee Bureau of

---

[13]Again, as to JP, the petitioner was convicted of aggravated burglary, theft of property, and rape.

Investigation, testified that she was able to analyze semen samples recovered from PM, ES, and JP. She also received a semen sample recovered from CM. However, the sample had not been stored properly and was not amenable to testing. Agent Choatie determined that the assailant in the cases pertaining to PM, ES, and JP, was a "non-secretor." She explained that eighty percent of the population secrete an "antigen" corresponding to their blood type. This antigen is found in bodily fluids, including semen. In contrast, twenty percent of the population do not secrete the antigen. Accordingly, the antigen will not be present in semen from a non-secretor. She confirmed that the petitioner is a non-secretor.

Agent Choatie also testified that, after conducting her tests, she forwarded the semen samples recovered from PM and JP to the Federal Bureau of Investigation for DNA testing. She did not forward the semen sample recovered from CM due to its improper storage. Moreover, Agent Choatie did not forward the semen sample recovered from ES, because she was unable to obtain a liquid blood sample from the victim, which item is essential to DNA testing.

Audrey Lynch, a special agent with the DNA Analysis Unit of the Federal Bureau of Investigation, testified that she had performed a procedure known as Restriction Fragment Length Polymorphism (RFLP) upon semen samples obtained in the cases of PM and JP.[14] Agent Lynch concluded that the DNA of the assailant in both cases "matched" that of the petitioner. She stated that one in one hundred and fifty million people in the black population would produce the same result.

---

[14]See State v. Chapman, No. 01C01-9604-CC-00137, 1997 WL 602944, at **9-12 (Tenn. Crim. App. at Nashville, September 30, 1997), perm. to appeal denied, (Tenn. 1998)(this court provided a thorough discussion of DNA and the RFLP method of DNA analysis).

**B.    Subsequent Procedural History**

As previously noted, the petitioner was convicted of all twenty-one charged offenses and sentenced to one hundred and sixty-five years in the Department of Correction.  On direct appeal, the petitioner raised the following issues:

1. Whether the trial court correctly determined that the petitioner's cases should be consolidated.

2. Whether the trial court abused its discretion by admitting evidence of DNA test results.

3. Whether the trial court correctly refused to provide a DNA expert at the State's expense.

4. Whether the trial court correctly granted the State's motion to amend the indictments.

5. Whether there was sufficient evidence to support the petitioner's five robbery convictions.

6. Whether the indictments charging the petitioner with first degree burglary alleged that the offenses occurred at night.

7. Whether the trial court correctly charged the jury that they should not draw any inference from the appellant's decision to forego testifying.

8. Whether the trial court correctly determined that the evidence warranted a jury instruction on common scheme or plan.

9. Whether the trial court abused its discretion in determining the hours for the trial.

10. Whether the indictments in cases No. 188343 and 188345 charged the appellant with first degree burglary and aggravated rape respectively.

11. Whether the cumulative effect of the errors deprived the petitioner of a fair trial.

12. Whether the trial court correctly determined the length of the petitioner's sentences and correctly determined that the petitioner should serve the sentences consecutively.

This court affirmed the petitioner's convictions, but modified his sentences, reducing his effective sentence to one hundred and twenty-nine (129) years incarceration in

12

the Department.  <u>Steele</u>, No. 03C01-9207-CR-233, 1993 WL 415836, at **8-9.  The

petitioner did not apply for permission to appeal to the supreme court at that time.


On September 18, 1995, the petitioner filed the instant petition for

post-conviction relief.[15]  In his petition, he alleged the following grounds for relief:

1.    The petitioner received ineffective assistance of counsel at trial and on direct appeal in violation of his rights pursuant to the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 9 of the Tennessee Constitution.

2.    At trial, the evidence was insufficient to support the petitioner's convictions, and this court denied the petitioner due process of law on direct appeal by failing to review the sufficiency of the evidence.

3.    The trial court's failure to provide the petitioner fingerprint and DNA experts denied the petitioner his right to a fair trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 9 of the Tennessee Constitution.

4.    The trial court erroneously admitted DNA evidence obtained from the petitioner in violation of his rights pursuant to the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 9 of the Tennessee Constitution.

5.    The trial court denied the petitioner due process of law by admitting fingerprint and DNA evidence.

6.    The trial court denied the petitioner due process of law by admitting testimony concerning the show-up identification of the petitioner.

7.    The trial court's instruction to the jury concerning reasonable doubt violated the petitioner's right to due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 8 of the Tennessee Constitution.

Moreover, the petitioner contended that he had been denied the opportunity to apply

_____

[15]The petitioner has also filed two petitions for habeas corpus relief in Wayne County. In each case, this court affirmed the trial court's denial of relief.  <u>Steele v. State</u>, No. 01C01-9708-CC-00105, 1998 WL 120308 (Tenn. Crim. App. at Nashville, March 18, 1998); <u>Steele v. State</u>, No. 01C01-9512-CC-00409, 1997 WL 211265 (Tenn. Crim. App. at Nashville, April 30, 1997).

for permission to appeal to the supreme court in violation of his rights to the effective assistance of counsel and due process of law. Following the appointment of counsel and an evidentiary hearing, the post-conviction court dismissed the petition, but recommended that the petitioner be permitted to submit a delayed application to the supreme court for permission to appeal.

On July 30, 1996, the petitioner filed a Notice of Appeal. The State subsequently filed a motion asking this court to grant the petitioner a delayed appeal and to hold the instant petition in abeyance pending the conclusion of proceedings before the supreme court. This court granted the State's motion on July 22, 1997. The petitioner filed an application for permission to appeal to the supreme court, which was denied on April 20, 1998.

## C.    Post-Conviction Evidentiary Hearing

The post-conviction court conducted an evidentiary hearing in the petitioner's case on July 1, 1996. The petitioner testified at the hearing. He testified that he was represented at trial by Lisa Mack, Paul Sorrick, and Mark Biesack, and he reiterated the arguments set forth in his petition. During cross-examination, he conceded that, in preparation for his trial, Lisa Mack visited him at the jail "very many times" in order to discuss his case. Moreover, he did not dispute "the sincerity of [his attorneys'] effort[s]."

Lisa Mack, one of the petitioner's attorneys, also testified at the post-conviction hearing. She testified that she was appointed to represent the petitioner at an early stage in the trial proceedings. At some point during discovery, she learned that the State would be introducing DNA evidence at the petitioner's trial.

14

Accordingly, she conducted a considerable amount of research and, at trial, cross-examined the State's DNA expert with treatises documenting the unreliability of DNA evidence. The State's expert testified that he disagreed with the treatises. Ms. Mack stated at the post-conviction hearing that a defense expert would have been useful in rebutting the testimony by the State's expert. Yet, she conceded that, although Mr. Sorrick orally argued a motion for a DNA expert, she could not recall filing a written motion for a DNA expert nor any affidavit from a DNA expert demonstrating the necessity for an expert. Ms. Mack also could not recall filing a motion in limine asking that the DNA evidence be excluded at trial.

On cross-examination, Ms. Mack stated that she understood, at the time of the petitioner's trial, that the State was not required to provide the petitioner a DNA expert. Ms. Mack also identified several pre-trial motions, signed by the petitioner's attorneys. The motions included: Motion for Expert Witness at State Expense; Motion for Pre-Trial Hearing, requesting a hearing "to determine whether forensic DNA identification is admissible based on ... FRYE v. US;" Motion for Name of Procedure, asking the State to furnish the name of the procedure used in the DNA identification of the [petitioner];" and Motion for Data, requesting information concerning "the raw population data on which conclusions about allele frequencies were predicated, thus enabling DNA identification of [the petitioner]."

Paul Sorrick also testified. He conceded that he did not request a fingerprint expert in the petitioner's case. He stated that he reviewed the fingerprint evidence and concluded that an expert would not be useful. However, he admitted that the State's testimony concerning the fingerprint evidence was, at times, contradictory.

15

Mr. Sorrick further recounted that the petitioner's cases were consolidated for trial over the "strenuous objections" of defense counsel. He opined that, had the petitioner been tried separately for cases relating to each of the eight different incidents, the petitioner would have been convicted in one or two series of cases and "there was a reasonable chance of acquittal in the other cases." He stated that he thought the defense team had submitted a memorandum of law concerning the consolidation of the petitioner's cases for trial and again observed that there was "strenuous argument" by the defense team against consolidation.

Mr. Sorrick also testified that he did not make an opening statement in the petitioner's case, because

> I do not believe you properly represent a defendant by making concessions to the State prior to their introduction of evidence and making out at least a prima facie case.
>
> And I don't think the defendant has the obligation to make such a statement and make such concessions, and contrary to the beliefs of some of my colleagues, I think that probably you're treading on dangerous ground when you do make an opening statement prior to the presentation of the State's proof. ...
>
> In an opening statement, you're going to take positions, you're going to make some concessions even, and I don't think that it serves the defendant to do that until the State has shown its proof so that you know where you stand.

Mr. Sorrick, therefore, requested that his argument be reserved until the conclusion of the State's proof.

Finally, the petitioner presented the testimony of Hallie McFadden, an attorney employed by the local public defender's office. She testified that, had she been representing the petitioner, she would have filed a brief in response to the State's motion and brief concerning the consolidation of the petitioner's cases. She

16

would have argued that she could not effectively represent the petitioner if the cases were consolidated, and she would have argued that the prejudicial impact of consolidating the cases outweighed any interest of judicial economy. She opined that the State can more easily obtain a conviction when several cases are consolidated for trial. However, she conceded to the court that consolidation of cases is not always contrary to a defendant's interests.

With respect to the State's DNA evidence, Ms. McFadden testified that she would have filed a motion seeking the appointment of a DNA expert. She would have attached to the motion an affidavit attesting to her lack of expertise in the science of DNA. She also would have attempted to contact a DNA expert in order to obtain an affidavit concerning the expert's qualifications, his or her fee, and the amount of time required for any additional testing or evaluation of the State's evidence. She stated that she would have further attached literature concerning the unreliability of DNA evidence. She concluded that she would have engaged in similar preparation with respect to any fingerprint evidence.

## II. Analysis

### A.   Ineffective Assistance of Counsel

The petitioner first challenges the performance of his counsel at trial and on direct appeal. We initially note that the petitioner bears the burden in post-conviction proceedings of proving the allegations in his petition by clear and convincing evidence. Tenn. Code. Ann. § 40-30-210(f) (1997). In other words, if afforded a post-conviction evidentiary hearing, a petitioner must do more than merely present evidence tending to show incompetent representation. Bilbrey v. State, No. 03C01-9711-CR-00498, 1998 WL 827080, at *2 (Tenn. Crim. App. at Knoxville, December 1, 1998), perm. to appeal denied, (Tenn. 1999). Additionally,

17

the findings of fact of the post-conviction court are afforded the weight of a jury verdict and are conclusive on appeal unless the evidence in the record preponderates against those findings. Henley v. State, 960 S.W.2d 572, 578-579 (Tenn. 1997), cert. denied, __ U.S. __, 119 S.Ct. 82 (1998); Bates v. State, 973 S.W.2d 615, 631 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1997), cert. denied, __ U.S. __, 118 S.Ct. 2067 (1998).

The post-conviction court in this case concluded that the petitioner had received the effective assistance of counsel. Accordingly, this court must determine whether the evidence preponderates against the post-conviction court's findings (1) that counsel's performance was within the range of competence demanded of attorneys in criminal cases, Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), and (2) that any deficient performance did not prejudice the petitioner. Strickland v. Washington, 466 U.S. 668, 687-697, 104 S.Ct. 2052, 2064-2069 (1984). See also Henley, 960 S.W.2d at 579-580; Powers v. State, 942 S.W.2d 551, 557 (Tenn. Code. Ann. 1996). Courts need not address these components in any particular order or even address both if the petitioner fails to meet his burden with respect to one. Henley, 960 S.W.2d at 580.

In evaluating counsel's performance, this court should not examine every allegedly deficient act or omission in isolation, but rather in the context of the case as a whole. State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The primary concern of the court should be the fundamental fairness of the proceeding whose result is being challenged. Id. (citation omitted). Therefore, this court should not second-guess tactical and strategic decisions by defense counsel. Henley, 960 S.W.2d at 579. Instead, this court must reconstruct the circumstances of counsel's challenged conduct and evaluate the conduct from counsel's

18

perspective at the time. Id. See also Irick v. State, 973 S.W.2d 643, 652 (Tenn. Crim. App.), perm. to appeal denied, (Tenn.), cert. denied, __ U.S. __, 119 S.Ct. 219 (1998). Moreover, the fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1997); Dickerson v. State, No. 03C01-9710-CR-00472, 1998 WL 619110, at *1 (Tenn. Crim. App. at Knoxville, September 16, 1998), perm. to appeal denied, (Tenn. 1999).

In sum, a defendant is not entitled to perfect representation, only constitutionally adequate representation. Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). Thus, we have observed:

> In order to pass constitutional muster, counsel need not discover every possible item of information before trial, make every possible objection during trial, or use every trial tactic which petitioner would in retrospect, now require ... .

Allen v. State, No. 960, 1991 WL 154520, at *2 (Tenn. Crim. App. at Knoxville, August 14, 1991).

If the petitioner establishes that counsel's performance was not within the requisite range of competence, his task is not complete. He must also demonstrate a reasonable probability that the result of the proceeding would have been different but for the defective performance of counsel. Henley, 960 S.W.2d at 580.

> "A court must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect ... ."

19

Id. (citations omitted). With these general principles in mind, we address the petitioner's specific allegations of ineffective assistance of counsel.

### 1. DNA Evidence

The petitioner first argues that his trial counsel were ineffective for failing to demonstrate to the trial court a particularized need for a DNA expert. The record reflects that, on July 9, 1991, defense counsel sent the following pre-trial motions to the assistant district attorney general prosecuting the petitioner's case: a motion requesting a DNA expert at the State's expense;[16] a motion challenging the admissibility of the State's DNA evidence; a motion requesting the name of the DNA test used by the State's expert; and a motion requesting "the raw population data on which conclusions about allele frequencies were predicated, thus enabling DNA identification of this Defendant." Subsequently, at a hearing on July 11, 1991, the petitioner's counsel orally reiterated their request for the appointment of a DNA expert. The court denied the petitioner's request, stating that he possessed no authority to provide the petitioner such an expert at the State's expense. The prosecutor then observed that the State's expert was going to conduct a seminar prior to trial to educate both the prosecutor and defense counsel concerning DNA.[17]

At the post-conviction hearing, the court observed that defense counsel had "tried their best to get me to have, to allow them to have an expert, too, and I turned them down on that." The court noted that, at the time of the petitioner's

---

[16]This court's opinion on direct appeal seems to reflect that this motion was not included in the record at that stage of the proceedings.

[17]At the post-conviction hearing, the petitioner submitted the motions listed above. We note that the motions do not contain a stamp by the Clerk's Office of the Hamilton County Criminal Court, reflecting receipt of the motions in that office. The motions are not included in the technical transcript of the trial court proceedings. Nevertheless, the transcript of the July 11, 1991, pre-trial hearing reflects that the prosecutor received the motions. Moreover, both the trial court and the parties addressed the motions at this hearing.

trial, Tennessee law did not authorize the appointment at the State's expense of a DNA expert in criminal trials, and that it had denied the petitioner's motion on this basis. As noted earlier, defense attorney Lisa Mack testified at the post-conviction hearing that she did not submit to the trial court an affidavit from a DNA expert explaining the need for a defense expert. She understood at that time that the State was not required to provide a DNA expert.

On direct appeal, this court addressed whether or not the trial court correctly denied the petitioner's motion for a DNA expert. This court concluded that, at the time of the petitioner's motion, there was no statutory right to a state-funded expert in non-capital cases. Steele, No. 03C01-9207-CR-233, 1993 WL 415836, at *3. Moreover, we concluded that the petitioner's counsel had not demonstrated that the services were necessary to his defense. Id. Again, the question now before this court is whether counsel's failure to demonstrate the necessity for a DNA expert was constitutionally deficient performance.

The petitioner relies upon Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087 (1985), in support of his contention. In Ake, the Supreme Court held that, when an indigent defendant demonstrates to a trial judge that his sanity will be a significant issue at trial, the State must provide the defendant access to a competent psychiatrist. 470 U.S. at 83, 105 S.Ct. at 1096. However, at the time of the petitioner's trial in this case, it was unclear that the Supreme Court's ruling in Ake should be extended to the provision of experts other than a psychiatrist in the context of a defendant's claim of insanity, and it was unclear whether Ake should be extended to non-capital cases.

Prior to Ake, our supreme court had held that an indigent defendant

21

did not have a right, under either the federal or the state constitutions, to the services of any expert at the State's expense. State v. Williams, 657 S.W.2d 405, 411 (Tenn. 1983); Graham v. State, 547 S.W.2d 531, 535-536 (Tenn. 1977). Even following Ake, this court upheld in a non-capital case a trial court's refusal to provide a ballistics expert to the defendant at the State's expense. State v. Evans, 710 S.W.2d 530, 533-534 (Tenn. Crim. App. 1985). This court distinguished Ake, in part, because the defendant in Ake was confronted with a rebuttable presumption of sanity and because Ake was a capital case. Id. at 534. Subsequently, in State v. Lambert, 741 S.W.2d 127, 131 (Tenn. Crim. App. 1987), this court declined to decide the issue of Ake's application in non-capital cases. See also State v. Harris, 866 S.W.2d 583, 585 (Tenn. Crim. App. 1992)(this court cited Lambert, noting that we had previously "expressed concern over the broadening of the Ake ruling to include non[-]capital cases such as the present one").

However, following Ake and prior to the petitioner's trial, this court noted in State v. Phillips, 728 S.W.2d 21, 24-25 (Tenn. Crim. App. 1986), a non-capital case, that a threshold showing of a denial of due process of law might entitle the defendant to the appointment of an expert at the State's expense. In State v. Hannah, No. 224, 1989 WL 16677, at **1-2 (Tenn. Crim. App. at Knoxville, February 28, 1989), an unpublished case, this court acknowledged an indigent defendant's right in a non-capital case to expert assistance, if a denial of assistance would result in a constitutional deprivation under the doctrines of due process and equal protection.

Nevertheless, only in 1995, in State v. Barnett, 909 S.W.2d 423, 427 (Tenn. 1995), did our supreme court determine that the principles set forth in Ake were equally applicable in non-capital cases. Significantly for the purposes of this

22

case, the court noted that it had never previously considered this issue and that the court of criminal appeals had also never been required to definitively reach this issue. Id. Thus, in State v. Jacobs, No. 01C01-9601-CC-00048, 1997 WL 576493, at *2 (Tenn. Crim. App. at Nashville, September 18, 1997), this court observed that, as late as 1994, Tennessee law did not provide for a state-paid DNA expert in non-capital cases, concluding that Barnett announced a new constitutional rule. See also State v. Cage, No. 01C01-9605-CC-00179, 1999 WL 30595, at *7 (Tenn. Crim. App. at Nashville, January 26, 1999)(prior to Barnett, Tennessee law did not provide for the appointment of a DNA expert in non-capital cases); State v. Murray, No. 01C01-9702-CR-00066, 1998 WL 934578, at * 22 (Tenn. Crim. App. at Nashville, December 30, 1998)(prior to Barnett, Tennessee law did not provide for expert assistance in non-capital cases). This court further clarified that, while Barnett, like Ake, dealt with a psychiatric expert, the new constitutional protections announced in Barnett applied to other forms of expert assistance, including a DNA expert. Jacobs, No. 01C01-9601-CC-00048, 1997 WL 576493, at *2.

Again, it is important to reconstruct the circumstances of counsel's performance and evaluate that performance from the perspective of counsel at that time. Henley, 960 S.W.2d at 579. In light of the uncertain status of the law at the time of the petitioner's trial, defense counsel's research on the reliability of DNA testing, and counsel's extensive cross-examination of the State's expert, this court hesitates to conclude that counsel's failure to more vigorously pursue the appointment of a DNA expert constituted ineffective assistance of counsel. Certainly, Ms. McFadden's evaluation of defense counsel's performance was influenced by her access to the clear guidelines set forth in Barnett, an advantage not shared by defense counsel at the petitioner's trial.

23

In any case, the petitioner has failed to demonstrate that any deficiency of performance prejudiced the outcome of his trial. The petitioner's attorney, Lisa Mack, testified at the post-conviction hearing that a defense expert would have been useful in rebutting the State expert's testimony concerning the reliability of DNA testing. At the post-conviction hearing, the petitioner further submitted articles concerning potential problems of reliability in DNA testing. However, even assuming that the law at the time of the petitioner's trial provided for the appointment of a DNA expert in non-capital cases, it was unclear what "threshold showing" would entitle a defendant to the services of an expert. Under Barnett, 909 S.W.2d at 430-431 (emphasis added), a defendant is required "to demonstrate *by reference to the facts and circumstances of his particular case,* that appointment of a[n] ... expert is necessary to insure a fair trial." Thus, in Jacobs, No. 01C01-9601-CC-00048, 1997 WL 576493, at *3, this court concluded that a mere assertion that a defendant needs his own DNA expert to verify the results of the State's testing is insufficient.

In this case, the petitioner seems to argue that, because there is controversy in the scientific community concerning the degree of reliability of DNA testing, he was entitled to a DNA expert to explain to the jury the potential problems associated with DNA testing. At the post-conviction hearing, the petitioner did not point to any deficiency in the testing performed in *his case*, nor does he cite any deficiency in his brief on appeal. In essence, the petitioner's argument would require the appointment of a DNA expert in every case in which the State planned to introduce DNA test results. The petitioner cites no authority in this state for this proposition, nor have we discovered any. But see generally, John Devlin, Genetics and Justice: An Indigent Defendant's Right to DNA Expert Assistance, 1998 U. Chi. Legal F. 395, 397 (arguing that an indigent defendant charged with rape or murder

24

should receive DNA expert assistance whenever the prosecution plans to use DNA evidence against him). Applying the principles set forth in <u>Barnett</u>, the petitioner has failed to demonstrate in these proceedings *the particular facts and circumstances of his case* which required the appointment of a DNA expert. In other words, the petitioner has failed to establish that, with additional effort, his attorneys *could* have shown a particularized need for a defense expert.[18]

Moreover, we agree with the post-conviction court's observation that the State's evidence in these cases, excluding the DNA evidence, was overwhelming. The DNA evidence only related to the following incidents:

1. First degree burglary and aggravated rape of PM in cases No. 188342 and No. 188345.
2. Aggravated burglary, theft of property, and rape of JP in cases No. 188327, No. 188325, and No. 188326.

The State introduced testimony that fingerprints matching the petitioner's had been recovered from the scenes of all eight incidents underlying the petitioner's indictments, including the incidents relating to PM and JP. Seven victims, including PM and JP, were able to provide descriptions of the assailant. The descriptions were roughly similar to one another and matched the petitioner's appearance. With respect to the incident involving JP, the petitioner was observed immediately following the incident running down the street four blocks away from JP's residence. JP positively identified the petitioner both in a show-up identification procedure immediately following the incident and at trial. Testimony by PM and another victim, CM, suggested that the assailant was left-handed. The petitioner is left-handed. The petitioner had scars in a location where one of the victims had stabbed her assailant with a screw driver. The petitioner lived and worked in close proximity to

---

[18]As we already observed, <u>Barnett</u> was decided after the petitioner's trial. Nevertheless, to the extent that there existed a right to expert assistance in non-capital cases prior to <u>Barnett,</u> we doubt that it was broader than the right defined in that case.

the locations of all eight incidents. An expert in serology with the Tennessee Bureau of Investigation testified that, with respect to the incidents involving PM, JP, and another victim, ES, she was able to establish that the Petitioner was within the twenty percent of the population who could have committed the crimes. Moreover, as noted earlier, all eight incidents possessed similar characteristics strongly suggesting a common perpetrator. Accordingly, it is doubtful that the provision of an expert to testify concerning the reliability of the DNA testing would have changed the results in any of the petitioner's cases.

Nevertheless, the petitioner also alleges that his counsel were ineffective for failing to file pre-trial motions objecting to the admission of the DNA evidence. However, the record suggests that defense counsel in fact filed a pre-trial motion challenging the admissibility of the DNA evidence. Moreover, the court observed at the post-conviction hearing that Ms. Mack and Mr. Sorrick had brought to his attention literature concerning the unreliability of DNA testing and "we did have a hearing on it and [Ms. Mack] did try to convince me that the manner and the test, the way the tests were conducted was unreliable. She did not succeed in convincing me."[19]

_____Accordingly, the record that is before this court does not support the

---

[19]Following the petitioner's trial and the trial court's denial of the petitioner's Motion for New Trial, the petitioner submitted a Motion to Reconsider. The petitioner attached to his motion additional articles concerning the reliability of DNA testing. At a hearing on April 28, 1992, the trial court concluded:

> [T]here is merit in what you have to say ... . And you raise a very valid issue about genetic testing. And not only in the National Law Journal has there been some question about the testing, the accuracy of it, but in the general news media. I think Newsweek had something about it recently ... .
>
> If the only proof against Mr. Steele was DNA, I would grant your motion to reconsider. But there is too much other proof pointing to his guilt that corroborates the genetic testing.

petitioner's allegation.  Moreover, the petitioner has failed to include in the record before this court the transcript of the trial court hearing on the admissibility of the DNA evidence.  The petitioner carries the burden of ensuring that the record on appeal conveys a fair, accurate, and *complete* account of what has transpired with respect to those issues that are the bases of appeal.  Tenn. R. App. P. 24(b).  See also Thompson v. State, 958 S.W.2d 156, 172 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1997).  The failure to do so results in a waiver of such issues.  Id.

Finally, this court on direct appeal determined that the DNA evidence was admissible in the petitioner's trial.  Steele, No. 03C01-9207-CR-233, 1993 WL 415836, at **2-3.  Accordingly, any deficiency of counsel in this respect was not prejudicial.  In effect, this issue has been previously determined and may not be relitigated in these proceedings, even if in the guise of an allegation of ineffective assistance of counsel.  Tenn. Code. Ann. § 40-30-206(h) (1997).

### 2.    Fingerprint Evidence

The petitioner next appears to argue that his trial counsel were ineffective for failing to file a pre-trial motion requesting the appointment of a fingerprint expert and for failing to challenge the admission of fingerprint evidence.  Because the petitioner's argument consists of one fragment of a sentence in his brief, we regard this issue as waived under Ct. of Crim. App. Rule 10(b).

Moreover, the petitioner's trial attorney testified that he reviewed the fingerprint evidence and determined that a defense expert would not be useful.  Again, assuming that the law at the time of the petitioner's trial provided for the appointment of a fingerprint expert in non-capital cases, the petitioner has utterly failed to demonstrate that his attorney's exercise of professional judgment was

27

erroneous.

In order to demonstrate a particularized need for a fingerprint expert, the petitioner did attempt to establish at the post-conviction hearing that the State's fingerprint expert provided contradictory testimony. However, the record reflects that the sole contradiction in the expert's testimony was between his initial testimony that he generally used at least six to eight points of comparison in comparing latent and ink fingerprints and his subsequent testimony that, *in this case*, he probably used at least ten points of comparison on each print. Both the State's fingerprint expert and an identification technician with the Chattanooga Police Department testified that there is no standard number of comparison points in the field of fingerprint identification. Therefore, it is unclear from the record before this court what testimony or assistance an expert could have contributed to the petitioner's defense.

It is similarly unclear on what basis defense counsel should have objected to the admission at trial of the fingerprint evidence. The burden is upon the petitioner in post-conviction proceedings to establish the allegations in his petition. This issue is devoid of merit.

### 3. Consolidation of the Petitioner's Cases

The petitioner also alleges that his counsel were ineffective for failing to adequately research and object to the consolidation of the petitioner's cases. However, on direct appeal, this court determined that the trial court correctly consolidated the petitioner's cases. Steele, No. 03C01-9207-CR-233, 1993 WL 415836, at **1-2. Thus, any deficiency of counsel in this respect was not prejudicial. Once again, the petitioner is attempting to assert an issue that has been previously

28

determined on direct appeal by characterizing the issue as ineffective assistance of counsel. Tenn. Code. Ann. § 40-30-206(h). This issue is not cognizable in these proceedings.

### 4. Jury Sequestration

The petitioner next alleges that his counsel were ineffective for "waiving sequestration of the jury in such a high profile case which was widely publicized in the media both prior to and during trial." However, other than this single sentence, the petitioner offers no further argument nor citations to relevant authorities or even the record in this case. The petitioner's presentation of this issue is patently inadequate and is waived pursuant to Ct. of Crim. App. Rule 10(b). In any case, this issue is without merit.

The record reflects that the petitioner waived his right to a sequestered jury on the condition that the trial court poll the jurors each morning in order to determine if they had been exposed to media coverage. See Jones v. State, 915 S.W.2d 1, 2 (Tenn. Crim. App. 1995)(a defendant may waive his right to a sequestered jury). The record reflects that, with the exception of the final day of trial, the trial court complied with this condition. With respect to the final day of trial, the record does not contain any objection by defense counsel or request that the jurors be polled. Nevertheless, the record reveals that, throughout the trial, the court repeatedly instructed the jurors to avoid any media coverage of the trial. Nothing in the record suggests that the jurors failed to comply with the court's instruction. The record contains references by the trial court to newspaper and television coverage of the trial. However, no articles or recordings are included in the record in this appeal.

At the post-conviction hearing, the petitioner testified that his attorneys discussed with him sequestration of the jury, but that he did not understand their advice. In contrast to his petition for post-conviction relief and his brief on appeal, the petitioner orally argued to the trial court that failure to sequester the jury possibly "rushed" their decisions. He offered no proof to support this assertion or to demonstrate the exposure of any juror to media coverage of his trial. Moreover, neither the petitioner nor the State questioned the trial attorneys concerning this issue. In light of the lack of proof, we cannot conclude that counsel's waiver of a sequestered jury was an irrational or irresponsible strategy decision. Williams v. State, Nos 155, 1988 WL 79770, at *1 (Tenn. Crim. App. at Knoxville, August 1, 1988). Additionally, in these post-conviction proceedings the petitioner carried the burden of demonstrating prejudice resulting from counsel's recommendation that he waive his right to a sequestered jury. See, e.g., State v. Tolbert, No. 03C01-9707-CR-00325, 1998 WL 694931, at *12 (Tenn. Crim. App. at Knoxville, October 7, 1998), perm. to appeal denied, (Tenn. 1999). The petitioner has failed to satisfy this burden.

### 5.    Opening Statement

The petitioner also complains that his counsel failed to make an opening statement. However, Mr. Sorrick testified at trial that his decision to forego an opening statement was a tactical decision to avoid granting concessions to the State or adopting any positions prior to hearing the State's proof. We have previously held a waiver of an opening statement to be a valid strategy decision. State v. McCoy, No. 01C01-9603-CC-00109, 1997 WL 137422, at *3 (Tenn. Crim. App. at Nashville, March 27, 1997). Moreover, this court has previously acknowledged the potential pitfalls of opening statements:

> Either overstatement or misstatement during this
> presentation, despite curative efforts, may have adverse

30

effects:

> "The trial attorney should only inform the jury of the evidence that he is sure he can prove ... . His failure to keep [a] promise [to the jury] impairs his personal credibility. The jury may view unsupported claims as an outright attempt at misrepresentation."

State v. Zimmerman, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991)(citation omitted). Thus, a decision to forego argument to the jury until after the presentation of the State's proof will not dictate a finding of deficient performance. Moreover, contrary to the petitioner's assertion, the record before this court does reflect that defense counsel presented a closing argument to the jury. Accordingly, the petitioner has failed to demonstrate any prejudice arising from counsel's tactical decision. This allegation is without merit.

### 6. Jury Instruction on Reasonable Doubt

The petitioner next asserts that his counsel were ineffective in failing to object to the trial court's instruction on reasonable doubt, which referred to the need for "moral certainty" of the petitioner's guilt. The trial court instructed the jury:

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of guilt. Reasonable doubt does not mean a captious, possible or imaginary doubt. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required, and this certainty is required as to every proposition of proof requisite to constitute the offense.

This is a correct statement of the burden of proof required for criminal trials in Tennessee. State v. Hall, 976 S.W.2d 121, 159 (Tenn. 1998), cert. denied, _ _ U.S. __, __ S.Ct. __ (1999); State v. Bush, 942 S.W.2d 489, 520-521 (Tenn.), cert. denied, __ U.S. __, 118 S.Ct. 376 (1997); Scott v. State, No. 01C01-9709-CR-00400, 1999 WL 233643, at **9-10 (Tenn. Crim. App. at Nashville, April 20, 1999);

31

State v. Cowart, No. 03C01-9512-CR-00402, 1999 WL 5174, at *23 (Tenn. Crim. App. at Knoxville, January 8, 1999); Lane v. State, No. 02C01-9604-CC-00133, 1998 WL 756746, *7 (Tenn. Crim. App. at Jackson, October 30, 1998), perm. to appeal denied, (Tenn. 1999). Accordingly, the petitioner has failed to establish his allegation of ineffective assistance of counsel.

### 7.    Sufficiency of the Evidence

Finally, the petitioner argues that counsel were ineffective on direct appeal in failing to challenge the sufficiency of the evidence supporting all of the petitioner's convictions. Counsel chose to challenge only the petitioner's five convictions for robbery. However, there is no constitutional requirement that an attorney argue every issue on appeal. Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993). The determination of which issues to present on appeal is a matter which addresses itself to the professional judgment and sound discretion of appellate counsel. Id.

> "Legal contentions, like currency, depreciate through over-issue ... . [E]xperience on the bench convinces ... that multiplying assignments of error will dilute and weaken a good case and will not save a bad one."

Id. (citation omitted). Following a thorough review of the record, we must conclude that petitioner's counsel provided effective assistance on appeal. Moreover, we conclude that any deficiency of performance did not prejudice the petitioner. As noted earlier, the evidence at trial was overwhelming.

### B.    Waiver and Previous Determination

Post-conviction relief is generally not available to litigate issues that have been waived or previously determined. Tenn. Code. Ann. § 40-30-206(f), (g), and (h). We conclude that the petitioner has waived the following issues by failing to raise them in his motion for new trial or on direct appeal: the trial court denied him

32

due process of law by admitting fingerprint evidence; the trial court denied him due process of law by admitting testimony concerning the show-up identification of the petitioner;[20] the trial court denied him due process of law in instructing the jury on reasonable doubt; insufficient evidence supported the petitioner's convictions of the charged offenses.[21]

With respect to the petitioner's challenge to the sufficiency of the evidence, the petitioner appears to further argue that this court committed error on direct appeal by failing to address sua sponte the sufficiency of the evidence supporting all of the petitioner's convictions. Initially, we note that, in non-capital cases, it is an exercise of this court's discretion to recognize plain error pursuant to Tenn. R. Crim. P. 52(b). In any case, we again agree with the trial court's observation that the proof in the petitioner's cases was overwhelming.

Additionally, the petitioner's challenge to the trial court's admission of DNA evidence was previously determined on direct appeal and is not cognizable in these proceedings.[22] With respect to the trial court's denial of a DNA expert, this

---

[20]In asserting this due process claim, the petitioner notes that his trial counsel failed to object to the introduction of this testimony. However, nowhere in the petitioner's brief does he allege that this omission constituted ineffective assistance of counsel.

[21]As to any challenge to the sufficiency of the evidence supporting the petitioner's convictions for robbery, this court previously determined this issue on direct appeal.

[22]On direct appeal, this court noted that the standard of admissibility for scientific evidence was governed by Tenn. R. Evid. 702 and 703, and not by the test set forth in Frye v. United States, 293 F. 1013 (D.C.Cir. 1923). Recently, our supreme court clarified this standard in McDaniel v. CSX Transportation, Inc., 955 S.W.2d 257, 263-265 (Tenn. 1997), cert. denied, __ U.S. __, 118 S.Ct. 2296 (1998). See also State v. Begley, 956 S.W.2d 471, 475 (Tenn. 1997). The supreme court agreed that the adoption of the rules of evidence has superseded the general acceptance test of Frye, although the general acceptance of evidence in the scientific community remains a factor to be considered. See also State v. Chapman, No. 03C01-9802-CC-00080, 1999 WL 274911, at *6 (Tenn. Crim. App. at Knoxville, May 5, 1999)(the admissibility of expert testimony concerning DNA analysis is governed by the standards set forth in Tenn. R. Evid. 702 and 703). The RFLP method of DNA testing employed in this case has been approved both under the Frye test and under Tenn. R. Evid.

court addressed the trial court's denial on direct appeal. However, this court's decision was filed prior to the supreme court's decision in <u>Barnett</u> and prior to subsequent decisions in this court interpreting <u>Barnett</u> to apply to experts in fields other than psychiatry. As noted earlier, this court has previously held that the supreme court's decision in <u>Barnett</u> announced a new constitutional rule. Thus, arguably, this issue was neither capable of previous determination nor waived. Tenn. Code. Ann. § 40-30-206(g)(1).

Yet, it is unclear that the rule announced in <u>Barnett</u> should be retroactively applied in post-conviction proceedings. In <u>Barnett</u>, our supreme court rested its holding upon the federal constitution. <u>Barnett</u>, 909 S.W.2d at 431 ("[w]e conclude that when a defendant in a non-capital case demonstrates to the trial court in an ex parte proceeding that his sanity at the time of the offense is to be a significant factor at trial, the *federal constitution*, at a minimum, requires the State to provide the defendant access to a ... psychiatrist"). Therefore, we must apply federal retroactivity analysis. <u>Meadows v. State</u>, 849 S.W.2d 748, 754 (Tenn. 1993). A new rule of federal constitutional law is only applied retroactively to cases on collateral review if (1) the rule places certain kinds of primary, private, individual conduct beyond the power of the state to proscribe, or (2) the rule requires the observance of procedures implicit in the concept of ordered liberty. <u>Teague v. Lane</u>, 489 U.S. 288, 307-310, 109 S.Ct. 1060, 1073-1075 (1989).

Federal courts applying the <u>Teague</u> analysis to the United States Supreme Court's decision in <u>Ake</u> have declined to require retroactive application of the rule announced therein. <u>Gretzler v. Stewart</u>, 112 F.3d 992, 999-1000 (9th Cir.

---

702 and 703. <u>State v. Harris</u>, 866 S.W.2d 583, 586 (Tenn. Crim. App. 1992); <u>State v. Chapman</u>, No. 01C01-9604-CC-00137, 1997 WL 602944, at \*\*12-13 (Tenn. Crim. App. at Nashville, September 30, 1997), <u>perm. to appeal denied</u>, (Tenn. 1998).

1997); <u>Bassette v. Thompson</u>, 915 F.2d 932, 938-939 (4th Cir. 1990). Logically, if the rule announced in <u>Ake</u> does not require the observance of procedures implicit in the concept of ordered liberty, then application of the rule in <u>Ake</u> to non-capital cases similarly does not qualify as a "'watershed rule[] of criminal procedure.'" <u>Gretzler</u>, 112 F.3d at 999.

However, we need not resolve this issue due to this court's Order vacating our opinion on direct appeal and re-entering the opinion as of July 22, 1997. The petitioner's convictions did not become final until the supreme court denied the petitioner permission to appeal on April 20, 1998.[23] A new federal rule *is* retroactively applied to all cases, state or federal, pending on direct review or not yet final at the time the new rule is adopted. <u>Meadows</u>, 849 S.W.2d at \*\*753-754. In any case, even applying <u>Barnett</u> to the petitioner's case, we have already concluded that the petitioner failed both during the trial proceedings and during the post-conviction proceedings to demonstrate a particularized need for the appointment of a defense expert. <u>See, e.g.,</u> <u>Jacobs</u>, No. 01C01-9601-CC-00048, 1997 WL 576493, at \*3. Moreover, assuming that <u>Barnett</u> required the appointment of a DNA expert in this case, the trial court's denial of expert assistance was harmless beyond a reasonable doubt. Once again, even absent the DNA evidence, the State presented overwhelming proof of the petitioner's guilt.

### III. Conclusion

For the foregoing reasons, we affirm the judgment of the post-conviction court.

---

[23]We note that the petitioner cited <u>Barnett</u> in his application for permission to appeal to the supreme court on September 23, 1997. However, an issue is not previously determined solely by the supreme court's denial of permission to appeal, because the denial is not a determination on the merits. <u>Meadows</u>, 849 S.W.2d at 755.

_____
Norma McGee Ogle, Judge

CONCUR:


_____
James Curwood Witt, Jr., Judge


_____
John K. Byers, Senior Judge