IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 14, 2009

**STATE OF TENNESSEE v. E. LOUIS THOMAS**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 04-07385     John P. Colton, Jr., Judge**

---

**No. W2008-01360-CCA-R3-CD  - Filed July 29, 2010**

---

The appellant, E. Louis Thomas, was convicted by a jury in the Shelby County Criminal Court of one count of first degree premeditated murder and one count of felony murder. The convictions were merged, and the appellant received a sentence of life in the Tennessee Department of Correction. On appeal, the appellant challenges the sufficiency of the evidence supporting his convictions. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are**
**Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Larry E. Copeland (at trial and on appeal), Sean Muizers (at trial), and Joseph S. Ozment (on appeal), Memphis, Tennessee, for the appellant, E. Louis Thomas.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; William L. Gibbons, District Attorney General; and Glen Baity and James Wax, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

The Shelby County Grand Jury indicted the appellant for the first degree premeditated murder of Christopher Frazier and the first degree murder of Christopher Frazier in the perpetration of a robbery. At trial, the victim's sister-in-law, Sharon Daniels Frazier, testified

that the victim would have been thirty-eight years old at the time of trial and that he was 5'10" tall and weighed 175 pounds at the time of his death. On Wednesday, May 26, 2004, someone from the victim's employer, Montesi's Supermarket, called Mrs. Frazier to report that the victim had not shown up for work. Mrs. Frazier said the report was unusual because the victim never missed work. Mrs. Frazier went to the victim's house, but he was not there. At that time, she called police and reported the victim missing. Mrs. Frazier said that she last saw the victim the previous Sunday. The victim drove a gray Infiniti.

Memphis Police Officer Michael Gehringer testified that he was on duty on May 26, 2004, when dispatch informed him that the victim's employer, Victoria Montesi, had reported the victim missing. During his investigation, Officer Gehringer learned that on the night the victim disappeared, he spoke with his friend, Corey, then changed his clothes and went to meet his friend, Mack.

Larry Wilburn testified that on May 29, 2004, he and his cousin were canoeing on the Wolf River when they saw something that looked like a log floating in the water near a sandbar. Wilburn said that upon closer inspection, he discerned that the object in the river was a body. Following his discovery, Wilburn went "upriver" and called 911.

Memphis Police Officer Roger Wheeler testified that on May 28, 2004, he received a call directing him to investigate a "burnt out" silver Infiniti behind the Burlington Coat Factory. Officer Wheeler recalled that the inside and some of the outside of the car were burned.

In May 2004, Devin Ervin worked at Montesi's Store, and the victim was his supervisor. Mr. Ervin testified at trial that at approximately 10:15 p.m. on May 25, 2004, the victim drove him home because he did not have a car. During the drive, the victim received a call on his cellular telephone. The caller was "rushing" the victim, asking how much longer he would be. The victim told the caller that he would be on his way as soon as he took Mr. Ervin home. Mr. Ervin said the caller sounded like a young, white male.

Clay James Barnett testified that he was an investigator with First Tennessee Bank. In May 2004, he received a request from the Memphis Police Department to retrieve video of the unauthorized use of the victim's automatic teller machine (ATM) card. The victim's account records reflected that at 1:42 a.m. on May 26, 2004, his ATM card was used to withdraw five hundred dollars from the First Tennessee Bank ATM located at the Raleigh Financial Center. Within the next twenty-four hours, the victim's ATM card was used numerous times in an attempt to withdraw additional funds, but there was no more money in the account. Barnett acknowledged that a personal identification number (PIN) was necessary to withdraw funds using an ATM card.

Memphis Police Officer Danny Arquitt testified that on May 28, 2004, he was working in the crime scene unit and received a call about a burned, abandoned, 2004 Infiniti car behind the Burlington Coat Factory on Stage Road. The inside and tires of the car were burned.

The next day, Officer Arquitt was called to Kennedy Park in Raleigh. When he arrived at that location, he was directed to a boat ramp where he was advised that a body had been found in the Wolf River. Officer Arquitt looked for evidence around the boat ramp and found three burned red cloths, burned grass, white papers, tire impressions in the dirt, a cellular telephone, a water bottle, a key, footprints, a used condom, and a white t-shirt. Officer Arquitt said that a dirt road near the boat ramp led away from the park.

Memphis Police Offier Eric Hutchison testified that in May 2004 he worked in the North Precinct, which covered Kennedy Park. Officer Hutchison knew Percy Jones, the appellant's co-defendant, from the park where Jones had been found soliciting as a homosexual prostitute. Officer Hutchison said that Abbington Apartments, where Jones lived, was located near the north end of the park. He stated that a dirt road from the north end of the park led to the Wolf River boat ramp and that he often saw Jones on that road. Officer Hutchison saw a photograph in the Memphis Commercial Appeal newspaper showing Jones and another person using an ATM at a First Tennessee Bank less than two miles from Jones' apartment.

On May 30, 2004, Memphis Police Officer Daniel Jacobs was called to 4342 Creekwood Apartments #4, the appellant's apartment. He was asked to take photographs of evidence and tag the evidence for detectives. In the apartment, Officer Jacobs discovered a pistol, rope, a blue and white shirt with the words "dirty, dirty" on the front, a red Krystal's restaurant hat, and a red Krystal's restaurant visor.

Officer Jacobs also went to Jones' apartment. In the apartment, police discovered a Tennessee identification for Jones and a Mississippi Gaming Commission ticket issued to Jones at 5:52 a.m. on May 26, 2004, at the Gold Strike Casino. In a dumpster outside the apartment, police found a pair of blue jeans and a red jersey. The jersey matched the jersey worn by one of the defendants who was photographed using the victim's ATM card.

Ora Bright testified that she was a slot shift manager at the Gold Strike Casino Resort in Robinsonville, Mississippi. She said that while she was working on May 26, 2004, she saw a young black male she believed was gambling underage. Bright had an attendant ask for the male's identification and learned that he was in fact underage. He was with another young black male who was not underage. Bright immediately notified security.

Richard Pickens, an enforcement agent with the Mississippi Gaming Commission, testified that on May 26, 2004, he went to the Gold Strike Casino and spoke with Jones about underage gambling. Jones told Pickens that the appellant brought him to the casino and gave him money to gamble. Initially, the appellant told Pickens that he gave Jones money to play slot machines; however, he later said that he gave Jones money for the buffet.

Memphis Police Sergeant Robert Nelson testified that on May 30, 2004, he went to the appellant's apartment and arrested the appellant for the victim's homicide. The appellant told Sergeant Nelson that he had seen his photograph on the news and knew why he was being arrested. Sergeant Nelson took the appellant to the homicide office and advised him of his Miranda rights. The appellant told Sergeant Nelson that he completed the ninth grade, obtained his general equivalency diploma in 1996, and was not under the influence of an intoxicant. Sergeant Nelson stated that the conversation with the appellant was relaxed and calm, but he acknowledged that the appellant was handcuffed to a chair. The appellant waived his Miranda rights and gave his first written statement.

In the statement, the appellant said that he did not kill the victim and that he did not know who was responsible for the victim's death. The appellant said that he knew the victim because he and Jones washed the victim's car twice a month. The appellant said the victim occasionally took him and Jones to dinner. The appellant said he last saw the victim when he dropped off the appellant and Jones at the Gold Strike Casino on Wednesday night at 11:30 p.m. or 12:00 a.m. The appellant said he called the victim that night to tell him to meet them at a Chuck E. Cheese restaurant. The victim, who was driving a gray minivan, drove them to a Bank of America ATM on Austin Peay, gave them his ATM card and PIN, and told them to withdraw five hundred dollars. The appellant said that when they got out of the car at the ATM, the victim was talking on the telephone with someone who upset him.

The appellant said that after they left the ATM, the victim drove to a gas station where he bought a Dr. Pepper and twenty-seven dollars worth of gas. Upon leaving the gas station, the victim went to his house and changed from his work clothes to a red shirt and tan shorts. After changing, the victim drove the appellant and Jones to the Gold Strike Casino. The victim said he would return the next morning to pick them up. While at the casino, the appellant and Jones got in trouble for Jones' underage gambling. The appellant said the victim never came to pick them up. They were able to get a ride from a lady at the casino who lived in Memphis; she dropped them off at a "catfish place" on Austin Peay. Upon returning to Memphis, the appellant called the victim to ask why he did not come to the casino, but the victim never answered the call. The appellant said that he and Jones tried to withdraw money from the victim's account only once that night but that they had withdrawn money from the victim's account on several other occasions. At the conclusion of the interview, police transcribed a statement which the appellant reviewed and signed.

-4-

Afterward, police allowed the appellant to take a break, during which he smoked cigarettes and drank a soda. Meanwhile, the investigators who had been interviewing the appellant met with the investigators who had been interviewing Jones and compared their statements. Because of inconsistencies, Sergeant Nelson interviewed the appellant again. At that point, the appellant gave a second statement which he signed after it was transcribed by police.

In the second statement, the appellant told Sergeant Nelson that he and Jones were involved in the victim's death. He said that he met Jones on Monday, May 24, 2004. Jones told the appellant that he knew a man from whom he could get a bank card. Jones then called the victim. They talked for a while before Jones introduced the appellant to the victim. The victim wanted to meet the appellant, so Jones set up a meeting the next day.

The appellant said that the next day, the trio met at Raleigh Springs Mall at around 11:00 p.m. when the victim got off work. They went to a gas station where the victim got twenty-seven dollars worth of gas and bought Jones a Dr. Pepper. They left the gas station and went to the victim's house where the victim played a pornographic movie and asked whether the appellant was homosexual. When the appellant said no, the victim became angry and said he was going to take them home. But, the victim changed his mind and drove them to the park.

At the park, the victim again asked whether the appellant was homosexual, and the appellant repeated that he was not. The appellant said the victim was upset because he believed he and the appellant would have intercourse. The victim told the appellant to get out of the car. The victim grabbed a crowbar out of the back of the car and hit the appellant in the forehead, causing a knot. The appellant said he and the victim began fighting. During the fight, the victim slipped and fell. While the victim was down, Jones got tape from the car, wrapped it around the victim's arms, and the victim and the appellant resumed fighting. While they were fighting, Jones ran to his nearby apartment and returned with lighter fluid. He poured the lighter fluid on the victim and set him on fire. The appellant said that Jones "had it in mind" to set the victim on fire. Afterward, they put the victim, who was "screaming and hollering," in the river. The appellant drove the victim's car from the scene. Jones, who was in the passenger seat, found the victim's ATM card in the glove compartment. Jones knew the PIN, so they drove to an ATM and withdrew five hundred dollars, which they divided equally. Later, they tried unsuccessfully to withdraw additional funds. After obtaining the five hundred dollars, they went to the Gold Strike Casino. While there, the appellant bought a t-shirt and a hat. However, the gambling commission escorted them out because Jones was underage. After leaving the casino, the appellant and Jones went to Raleigh and parked at the Burlington Coat Factory. Jones left the victim's ATM card in the car, sprayed lighter fluid inside, and set the car ablaze. At that point, the appellant and

Jones went their separate ways, with the appellant going to the emergency room to have the knot on his forehead treated.

Sergeant Nelson said that during the interviews, he repeatedly told the appellant that he wanted the appellant to only tell the truth. At one point, the appellant began crying. Sergeant Nelson said that no crowbar was found at the scene and that he did not see any evidence that the appellant had been struck in the forehead.

Sergeant Nelson said that during the investigation he went to Yum's Deli because the victim's telephone records indicated he had been called from that location on the night of his disappearance. Theresa Gee was working in the deli on the night of the call, but she was unable to identify the appellant or Jones as being there at that time. Additionally, Sergeant Nelson noted that he talked with Corey Chism who stated that he spoke with the victim on the telephone the night of his disappearance.

Sergeant Nelson recalled that at 9:45 p.m. on May 29, 2004, he received a report from Crime Stoppers regarding two young men who were gambling in Tunica. The men matched the ATM photographs of the suspects which had been broadcast on the news. Police verified that the names of the two men matched the photographs in the police database for the appellant and Jones.

Memphis Police Sergeant Bettie Marie Carter testified that on May 30, 2004, she was present during the interviews with the appellant and that she typed his statement. She said that nothing was unusual about the appellant's appearance and that the appellant was not intimidated or threatened during the interviews.

Dr. Thomas Deering, the assistant medical examiner who performed the victim's autopsy, testified that the victim was identified through dental records. Dr. Deering stated that the victim's body was found in water, so it was wet when it came into the office. He observed that the victim was wearing shorts and sandals but no shirt. Dr. Deering said the body was decomposing, which made determining cause of death difficult.

Dr. Deering stated that the victim's hands were duct-taped together over his head. The duct tape was partially melted, and there were thermal burns on the skin of the victim's body above the waist, apparently caused by an accelerant poured on the body while it was face-up on the ground. Specifically, Dr. Deering observed burns to the victim's face, ears, neck, upper chest, arms, hands, and upper back. He stated that in some areas the burns were red, which could indicate that the victim was alive when he was burned or because of decomposition. Dr. Deering detected no evidence of bullet wounds, stab wounds, strangulation, or blunt trauma. Dr. Deering said the melting of the duct tape indicated that

it was already in place when the accelerant was ignited. He stated that the lack of bruising on the victim's wrists could indicate that he was dead, near death, or unconscious when he was taped.

The autopsy revealed a small amount of water in the victim's lungs and water in his sinuses. Dr. Deering explained that the water in the victim's sinuses was consistent with drowning but was a "soft finding" that was not definitive. Another "soft finding," a purple coloring of the victim's middle ears, also suggested drowning. Although Dr. Deering could not conclusively say whether the victim was alive when he was placed in the water, he opined that "it's certainly possible that drowning played a role" in the victim's death. The doctor concluded that the victim's death was caused by asphyxia, which was a "general medical term of exclusion of oxygen," and that both the burning and drowning contributed to the oxygen deprivation.

Defense witness Corey Jermaine Chism testified that he was the victim's friend. He said he was notified by the victim's family when the victim disappeared. Chism recalled that the last telephone conversation he had with the victim took place at midnight or later, but he could not recall the exact date of the conversation.

The appellant testified that he was arrested at approximately 10:00 a.m. and was taken to the homicide office. He was handcuffed to the table, but one hand was uncuffed while he drank a soda. He said he initially gave a verbal statement that was "the truth," but the police "weren't buying it" and called him "a liar." The appellant said at that point, he gave the first statement which the police transcribed. He said that statement was "a boldface lie," but he was trying to tell the police what they wanted to hear.

The appellant said the police beat him and threatened to charge him with numerous offenses to ensure he was unable to make bond. The officers told him they had a lot of evidence against him, including tire prints, footprints, ATM photographs, and a used condom. The appellant then gave a second written statement to the police. The appellant said that the second statement was also false and that he was again trying to say what the police wanted to hear.

The appellant testified that Jones signed an affidavit recounting the night of the crime. The appellant signed the affidavit, acknowledging that it was correct. The appellant testified, in conformity with the affidavit, that at approximately midnight on May 25, 2004, he walked to a store and saw a car that was running with no one in it. After buying chips and a soda, he left the store and saw that the car was still there. The appellant jumped in the car and drove away. In the front seat of the car, the appellant found a wallet containing an ATM card and an insurance card with the ATM card's PIN written on the back. The appellant picked

up Jones and told him the car belonged to the appellant's uncle. They drove around for a while and then went to an ATM to withdraw five hundred dollars from the victim's account. Later, they went to a Tunica casino. After Jones was reprimanded for underage gambling, they returned to Memphis and rented a hotel room.

The appellant conceded that he had an opportunity to correct both written statements before signing them. He said he read the statements and signed them, but the statements were false. The appellant acknowledged that he burned the victim's car, but he denied killing anyone.

At the conclusion of the proof, the jury found the appellant guilty of the premeditated first degree murder of the victim and the felony murder of the victim. The trial court merged the convictions and imposed a life sentence. On appeal, the appellant challenges the sufficiency of the evidence supporting his convictions. He also contends at trial that the State failed to establish the identity of the victim that the physical evidence shows only that he used the victim's ATM card, but not that he was involved in the victim's death. Further, he contends that there was insufficient evidence to establish the victim's identity.

## II. Analysis

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

We will first address the appellant's claim that the State failed to establish the identity of the victim. Generally,

> [t]he corpus delicti in a homicide case must be proven beyond
> a reasonable doubt before a defendant may be convicted. It
> consists of two (2) elements: (1) the death of a human being and

(2) criminal agency in producing that death. While the corpus delicti cannot be established solely by the defendant's statements, any other statements may be considered along with any other evidence, both direct and circumstantial to prove the corpus delicti.

State v. Shepherd, 902 S.W.2d 895, 901 (Tenn. 1995). In the instant case, Dr. Deering testified that the victim was identified as Mr. Frazier through dental records. Additionally, one of the appellant's statements indicated that he knew the victim. The statement reflected that the appellant and Jones taped Mr. Frazier's hands above his head, set him on fire, tossed him in the river, used his ATM card to withdraw money, gambled in Tunica with Mr. Frazier's money, and set fire to Mr. Frazier's vehicle. The victim was found in the river with burns on his body, including on his hands which were duct-taped above his head. ATM photographs and records support the appellant's statement that he and Jones withdrew money from the victim's account. We conclude that this evidence is sufficient to establish Mr. Frazier's identity as the victim. See State v. Reynolds, 666 S.W.2d 476, 478 (Tenn. Crim. App. 1984); Berry v. State, 523 S.W.2d 371, 373-74 (Tenn. Crim. App. 1974).

The appellant was convicted of the first degree premeditated murder of Mr. Frazier. Tenn. Code Ann. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). Premeditation can be inferred from the manner and circumstances surrounding the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Our supreme court has delineated several circumstances from which a jury may infer premeditation, including, but not limited to, declarations of the intent to kill, evidence of the procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. Id. The appellant was also convicted of the murder of Christopher Frazier during the perpetration of a robbery. Tenn. Code Ann. § 39-13-202(a)(2).

The jury was also instructed that they could find the appellant criminally responsible for Jones' conduct. "A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Tennessee Code Annotated section 39-11-402(2) provides that an appellant is criminally responsible for the actions of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, [the appellant] solicits, directs, aids, or attempts to aid another person to commit the offense." Specifically, when the appellant is aware of the intentions of his co-defendant and proceeds to aid or attempt to aid in the endeavor, the appellant is responsible for all natural and probable consequences of his

co-defendant's actions during the commission of the crime. State v. Richmond, 90 S.W.3d 648, 654 (Tenn. 2002); State v. Carson, 950 S.W.2d 951, 956 (Tenn. 1997).

In the light most favorable to the State, the evidence adduced at trial reflects that the appellant and Jones called the victim so they could "get" his ATM card. During the course of the evening, the three men went to the park, and the victim asked the appellant if he were homosexual. Because the appellant refused the victim's advances, the appellant and the victim fought. Jones duct-taped the victim's hands above his head then went to his apartment and got lighter fluid. The appellant admitted that he helped Jones put the victim in the river. The appellant said the victim was alive and screaming when they put him in the water. The appellant and Jones took the victim's car and his ATM card. They repeatedly attempted to withdraw money from the victim's account, ultimately obtaining five hundred dollars which they divided equally. Afterward, they went to a casino and gambled with the victim's money. Upon returning to Memphis, the appellant and Jones set fire to the victim's car. Dr. Deering largely corroborated the appellant's statement, noting that the victim was found with his hands duct-taped above his head and with burns on his body. Dr. Deering said an accelerant had been used on the victim after he was taped. Further, Dr. Deering said that some "soft finding[s]" indicated the victim was alive when he was put in the water. Bank records and ATM photographs confirmed that the appellant and Jones withdrew five hundred dollars from the victim's account and then gambled at a casino. The victim's car was later found, abandoned and burned. Based upon the foregoing, we conclude that there was sufficient evidence to sustain the appellant's convictions for premeditated first degree murder and felony murder.

### III.  Conclusion

Accordingly, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE